GOVERNOR OF THE STATE OF MARYLAND
ET AL. *v.* EXXON  CORPORATION
ET  AL.

[No. 10, September Term, 1976.]

*Decided February 18, 1977.*

412

*Motion for stay of mandate filed March 17, 3 motions for reconsideration filed March .18 and 1 March 21, 1977; .all motions denied April 13, 1977, see opinion by Eldridge, J., at 456.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE and ELDRIDGE, JJ., and JAMES C. MORTON, JR., and RIDGELY P. MELVIN, JR., Associate Judges of the Court of Special Appeals, specially assigned.

*Jon F. Oster, Deputy Attorney General,* and *John A. Woodstock, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Stephen M. Cordi, Glenn E. Bushel, Steven P. Resnick* and *Thomas M. Wilson, III, Assistant Attorneys General,* on the brief, for appellants.

*Amici curiae* brief filed by Day Enterprises, Inc., etc., Booth's, Inc., Dolan Enterprises, Inc. and PLB Industries,

Inc., *Robert G. Levy, George W. Liebmann* and *Frank, Bernstein, Conaway & Goldman* on the brief.

*Lewis A. Noonberg,* with whom were *William L. Marbury, David F. Tufaro, Piper & Marbury* and *Richard P. Delaney* on the brief, for appellee Exxon Corporation. *William Simon,* with whom were *Robert G. Abrams, Howrey & Simon, George W. Shadoan, Shadoan & Mack* and *A. M. Minotti* on the brief, for appellee Shell Oil Company. *Lawrence S. Greenwald,* with whom were *Gordon, Feinblatt, Rothman, Hoffberger & Hollander* on the brief, for appellee Gulf Oil Corporation. *Wilbur D. Preston, Jr.,* with whom were *Stanley B. Rohd* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellees Continental Oil Company and Kayo Oil Company. *Richard A. Reid,* with whom were *Royston, Mueller & McLean* on the brief, for appellees Petroleum Marketing Corporation and Commonwealth Oil Refining Company, Inc. *Fred W. Drogula,* with whom were *David Ginsburg, James E. Wesner, Ginsburg, Feldman & Bress, David F. Albright, Semmes, Bowen & Semmes* and *Arloe W. Mayne,* General Counsel, on the brief, for appellee Ashland Oil, Inc. Submitted on brief by *J. Edward Davis, Daniel T. Doherty* and *Weinberg & Green* for appellee Phillips Petroleum Company.

ELDRIDGE, J., delivered the opinion of the Court.

In this case we are presented with several questions concerning the constitutionality of Chapter 854 of the Laws of Maryland of 1974, as amended by Chapter 608 of the Laws of 1975, and codified in Maryland Code (1957, 1972 Repl. Vol., 1976 Cum. Supp.), Art. 56, § 157E. These chapters added the following provisions to the Motor Fuel Inspection Law (italicized portions are those added by Chapter 608 of the Laws of 1975):

> "(B) After July 1, 1974, no producer or refiner of petroleum products shall open a major brand, secondary brand or unbranded retail service station in the State of Maryland, and operate it with

company personnel, a subsidiary company, commissioned agent, or *under a contract with any person, firm, or corporation, managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.*

"(C) After July 1, 1975, no producer or refiner of petroleum products shall operate a major brand, secondary brand, or unbranded retail service station in the State of Maryland, with company personnel, a subsidiary company, commissioned agent, *or under a contract with any person, firm, or corporation managing a service station on a fee arrangement with the producer or refiner. The station must be operated by a retail service station dealer.*

"(D) Every producer, refiner, or wholesaler of petroleum products supplying gasoline and special fuels to retail service station dealers shall extend all voluntary allowances uniformly to all retail service station dealers supplied.

"(E) Every producer, refiner, or wholesaler of petroleum products supplying gasoline and special fuels to retail service station dealers shall apply all equipment rentals uniformly to all retail service station dealers supplied.

"(F) Every producer, refiner or wholesaler of petroleum products shall apportion uniformly all gasoline and special fuels to all retail service station dealers during periods of shortages on an equitable basis, and shall not discriminate among the dealers in their allotments.

"(G) The Comptroller may adopt rules or regulations defining the circumstances in which a producer or refiner temporarily may operate a previously dealer-operated station.

"(H) The Comptroller may permit reasonable exceptions to the divestiture dates specified by this

> section after considering all of the relevant facts and reaching reasonable conclusions based upon those facts."

In addition to the authority granted in Paragraphs G and H to promulgate rules and regulations for the temporary operation of retail service stations by producers and refiners, and to permit reasonable exceptions to the specified divestiture dates, *see* 2 Maryland Register 228, the Comptroller has the power generally to promulgate rules and regulations for the administration of the Motor Fuel Inspection Law, Art. 56, § 157B (a). Additionally, the Comptroller may direct those marketing petroleum products in violation of the Motor Fuel Inspection Law or regulations adopted pursuant thereto to cease such violations. If the violations should continue, the Comptroller shall refer the matter to the Attorney General who is authorized to apply to the circuit courts for an injunction against the continuance of the violations, Art. 56, § 157B (b). There are also criminal penalties for violation of the Motor Fuel Inspection Law, Art. 56, § 157K.

Chapter 854 was signed into law on May 31, 1974, effective July 1, 1974. On June 17, 1974, Exxon Corporation instituted an action in the Circuit Court for Anne Arundel County seeking a declaratory judgment pursuant to the Maryland Uniform Declaratory Judgments Act, Code (1974), § 3-401 *et seq.* of the Courts and Judicial Proceedings Article, that Chapter 854 be declared unconstitutional and invalid. Additionally, Exxon sought injunctive relief prohibiting enforcement of Ch. 854. Defendants in the action were the Governor of Maryland, the Attorney General of Maryland, and the Comptroller of the Treasury of Maryland.

Thereafter Continental Oil Company and its subsidiary Kayo Oil Company, Shell Oil Company, Gulf Oil Corporation, Phillips Petroleum Company, Commonwealth Oil Refining Company, Inc., and its subsidiary Petroleum Marketing Corporation, and Ashland Oil, Inc., filed substantially similar actions, and all actions were consolidated for trial. The plaintiffs either directly or

through their subsidiaries are all engaged in the direct retail marketing of petroleum products in the state of Maryland. All, with the exception of Commonwealth and Ashland, are large multi-national, fully integrated oil companies engaged in the production, refining, transportation and marketing of petroleum products. Commonwealth is a refiner dependent solely upon foreign crude oil supplies, and markets gasoline through its wholly owned subsidiary, Petroleum Marketing Corporation. Ashland is primarily a refiner and marketer of petroleum products, but does engage in some limited production of crude oil.[1] Additionally, four independent retail dealers of Crown Central Petroleum Corporation were permitted to appear in support of the Act as *amici curiae.*

The substance of the oil companies' attack on the validity of Chapter 854 is fairly represented by the allegations in Exxon's complaint. The Act was challenged on several grounds. Exxon alleged that the Act did not bear a real and substantial relationship to the health, safety, morals or welfare of the people of Maryland and thus denied it due process of law in violation of Art. 23 of the Maryland Declaration of Rights and the Fourteenth Amendment to the United States Constitution; that the Act discriminates against and unduly burdens interstate commerce and is invalid under the Commerce Clause, Art. 1, § 8 of the United States Constitution; that the Act constituted a taking of its investment in retail service stations without just compensation in violation of Art. III, § 40 of the Maryland Constitution and the just compensation clause of the Fifth Amendment to the United States Constitution; that the Act, in prohibiting only producers and refiners of petroleum products from engaging in the retail sale of gasoline, denied them the equal protection of the laws in violation of Art. 23 and the Fourteenth Amendment; and that the provisions of the Act authorizing the Comptroller to issue rules and regulations permitting exceptions to the divestiture dates and allowing temporary operation of retail service stations

---

1. The plaintiffs are hereafter sometimes referred to as "the oil companies."

by producers and refiners failed to set forth any standards to guide the Comptroller, and thus constituted an unlawful delegation of legislative authority in violation of Art. 8 of the Maryland Declaration of Rights. Additionally, it was alleged that the provision of the Act providing for equitable allocation of petroleum products was in conflict with the Federal Emergency Petroleum Allocation Act of 1975, 15 U.S.C. 751 *et seq.*, that the provision of the Act requiring uniform "voluntary allowances" was in conflict with the Robinson-Patman Act, 15 U.S.C. 13, and that, therefore, both provisions were invalid under the Supremacy Clause of Art. VI of the United States Constitution. Finally, it was alleged that certain provisions of the Act are void for vagueness.

On May 5, 1975, the circuit court, after a pre-trial conference, entered an order prohibiting the defendants from enforcing the provisions of Chapter 854 against the plaintiffs while the cases were pending. Plaintiffs were ordered not to open any new retail service stations operated with company personnel nor to convert existing retail service stations to direct company operation without first notifying defendants of their intention to do so and reasons therefor. Motions for partial summary judgment were then filed by Exxon, Shell and Gulf with respect to those provisions of the Act requiring uniform "voluntary allowances" (Paragraph D) and uniform allocation of products during periods of shortages (Paragraph F) on the ground that both were in conflict with federal law. The motion was granted with respect to Paragraph D on October 14, 1975. The case then proceeded to trial on the remaining issues.

Extensive evidence was presented at trial relating to the nature of the retail marketing of gasoline and petroleum products in Maryland and the alleged effect that the Act would have on the industry. Oil company officials, either by live testimony or by affidavits, testified that the Act would have an adverse effect insofar as the consumer is concerned. They testified that by prohibiting producers and refiners from operating retail service stations, producers and

refiners would lose the necessary control over operations to gauge accurately consumer preferences for such innovative features as self-service stations, car wash facilities, and total car care service facilities offering a national guarantee, thus allegedly depriving the consumers in Maryland of the wide variety of automotive services now available. They also testified that company operated stations [2] serve as training centers for independent dealers, insuring that consumers will be served by efficient, courteous and knowledgeable personnel at non-company operated stations. Additionally, executives of the three companies who market solely through company operated stations asserted that their type of low price-high volume stations could not be economically run with non-company personnel, and that, in all probability, they would be forced to withdraw from the Maryland market if the Act were to become effective. Four economists, qualified as expert witnesses, also testified on behalf of the oil companies in opposition to the Act. In general, they believed the Act would reduce competition and would therefore be detrimental to the interests of the consumer. This reduction of competition would occur because, in their view, the Act would inhibit new competitors from entering the market, force existing, highly aggressive independent marketers such as Petroleum Marketing Corporation and Commonwealth out of the market, and would also limit the variety of auxiliary services available to consumers by discouraging tests of innovative marketing techniques.

The State presented as its expert witness Dr. James M. Patterson, a professor of Business Administration, who is the author of two books on gasoline marketing. He testified that in his opinion the Act would actually enhance competition in gasoline marketing. Elimination of company operated stations would preserve "intertype competition,"

---

**2.** As used in this opinion, "company operated station" refers to a retail service station operated directly by employees of a refiner or producer of petroleum products, or a subsidiary of a refiner or producer. It does not refer to retail service stations operated by a company engaged only in the marketing of petroleum products.

which he described as competition among the various types of competitors in the marketplace such as private brand, non-integrated, and major brand marketers. On the other hand, increased company operation of service stations would, in his view, enable major integrated oil companies to use increased profits, resulting from the recent increases in crude oil prices, to drive various "price competitors" from the market as well as divert available gasoline supplies from independent, unbranded marketers. Such actions would, eventually, reduce overall competition in gasoline marketing. Evidence was also adduced by the State to show that several partially or fully integrated oil companies planned either to increase the number of company operated stations or to convert all stations to company operations. This, the State argued, tended to support Dr. Patterson's opinion that the major oil companies would seek to reduce competition among gasoline marketers by reducing the number of competitors.

Significant evidence concerning the history and purpose of Chapter 854 was also presented. On June 13, 1973, the Governor requested that the Comptroller conduct a study of gasoline retailing in Maryland. The purpose of the study was to determine if the then existing shortage of fuel was real or contrived, and also to determine whether company owned and operated service stations were receiving larger allocations of gasoline than dealer operated or independent stations. This request was motivated by the large number of complaints received by the Governor's office concerning the availability of gasoline, and the fact that some brands of gasoline appeared to be available in unlimited quantities while other brands were available only in limited quantities. On June 29, 1973, questionnaires prepared by the Gasoline Tax Division of the Comptroller's office were sent to registered gasoline service stations in the state. The results of this survey were tabulated, and a written analysis of the survey entitled "Results and Analysis of Service Station Dealers Questionnaire" was submitted to the Governor on September 6, 1973.

The results of the survey were tabulated according to the

type of service station responding to the questionnaire. Service stations were divided into four categories: retail service stations leased to a dealer by a major oil company; independently owned stations operated under a major brand; unbranded stations; and company operated stations. According to the survey, company operated stations were "either unrestricted in their purchases or were allocated 100% of their needs." Independently owned stations operated under a major brand name, however, were characterized as the "most abused" category, with a wide fluctuation in the percentage allocation based upon prior year purchases. According to the report, many were forced to close or restrict hours of operation because of decreased product availability. Unbranded stations and major stations leased to dealers fared better than independently owned stations, but both categories experienced reduced allocations from suppliers. The report concluded that company operated stations "were virtually unaffected insofar as gasoline availability was concerned" while both branded and unbranded independents experienced "the greatest difficulty in obtaining gasoline" and the "greatest cost per gallon increase."

Subsequent to submission of the report to the Governor, and after several discussions with the Governor, the Comptroller's office forwarded proposed legislation to the Governor on January 7, 1974, designed to correct the inequities in the distribution and pricing of gasoline reflected by the survey. Bills identical to the proposed legislation drafted by the Comptroller's office were introduced in both houses of the General Assembly.

The bills were then referred to the Senate Economic Affairs Committee and the House Economic Matters Committee, and both committees held public hearings on the bills. Representatives of the major oil companies appeared at both hearings in opposition to the proposed legislation. They denied allegations that the shortage of gasoline was contrived and that company operation of service stations promoted inequitable product allocation, cancellation of dealer leases and control of retail prices. The oil company

representatives believed that implementation of the legislation would decrease competition and would therefore be detrimental to the interests of Maryland consumers. Proponents of the bills also appeared at the hearings, including a representative of the Greater Washington/Maryland Service Station Association. He cited several recent examples of cancellations of dealer leases and conversions to company operation, as well as reduced allocation of products to dealers, to support his allegations that the major oil companies intended to control and monopolize retail marketing of gasoline by reducing and eliminating competition from independent dealers. Furthermore, he referred to a congressional report on the federal Petroleum Allocation Act expressing a similar concern over increased involvement of major oil companies in the retail marketing of gasoline. *See* Conference Report No. 93-628, 93d Cong., 1st Sess., *reprinted in* [1973] U. S. Code Cong. & Ad. News, 2688, 2707. The Comptroller also appeared in support of the Act, and submitted copies of his report and analysis of the dealer questionnaires to both committees.

The House and Senate Committees reported favorably on the bills. Both bills were amended by the removal of a prohibition against wholesalers operating retail service stations and by the addition of the provisions authorizing the Comptroller to adopt rules and regulations permitting temporary operation of stations by producers and refiners. In addition, the Senate bill was amended so as to authorize the Comptroller to allow reasonable exceptions to the divestiture dates specified in the bill. Both bills were then passed during the 1974 session of the General Assembly and submitted to the Governor for his approval. The Governor held a special veto hearing on the bills at which both proponents and opponents again testified. Thereafter, the House bill was vetoed, Laws of Maryland of 1974, pp. 3137-3138, and the Senate bill was signed into law by the Governor, becoming Chapter 854 of the Laws of Maryland of 1974.

At the conclusion of the trial, the circuit court filed a

decree declaring that Chapter 854 of the Laws of 1974 and Chapter 608 of the Laws of 1975 were unconstitutional and void. An injunction was also filed, enjoining the defendants from enforcing the statutes. Although the circuit court's holding was based primarily on the ground that the Act violated the due process clauses, the court also indicated that the Act was invalid for several other reasons raised by the oil companies. The defendants appealed from the judgment to the Court of Special Appeals, and we issued a writ of certiorari prior to a decision by the Court of Special Appeals.

On this appeal, the oil companies reiterate their challenge to the Act on all of the constitutional grounds raised below.

### (1) Due Process

The oil companies' main attack upon the statute is on so-called "substantive due process" grounds. They contend, as the trial court held, that the divestiture provisions of the Act (Paragraphs B and C) are an invalid exercise of the State's police power in violation of the Due Process Clause of the Fourteenth Amendment and Art. 23 of the Maryland Declaration of Rights.[3]

This Court has on numerous occasions in recent years discussed the standards applicable when the constitutionality of economic regulatory legislation is challenged on substantive due process grounds. *Westchester West No. 2 v. Mont. Co.*, 276 Md. 448, 348 A. 2d 856 (1975); *Steuart Petroleum Co. v. Board*, 276 Md. 435, 347 A. 2d 854 (1975); *Bowie Inn v. City of Bowie*, 274 Md. 230, 335 A. 2d 679 (1975); *Md. St. Bd. of Barber Ex. v. Kuhn*, 270 Md. 496, 312 A. 2d 216 (1973); *Md. Bd. of Pharmacy v. Sav-A-Lot*, 270 Md.

---

**3.** Art. 23 of the Maryland Declaration of Rights provides that "[n]o man ought to be . . . deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." As we pointed out last term in Westchester West No. 2 v. Mont. Co., 276 Md. 448, 465 n. 11, 348 A. 2d 856, 866 (1975),

"This Court has long equated Art. 23 with the Due Process Clause of the Fourteenth Amendment. *E.g.*, Bowie Inn v. City of Bowie, *supra*, 274 Md. at 235 n. 1; In re Easton, 214 Md. 176, 187, 133 A. 2d 441 (1957); Solvuca v. Ryan & Reilly Co., 131 Md. 265, 270, 101 A. 710 (1917); Pub. S. Com. v. N. C. Rwy Co., 122 Md. 355, 386, 90 A. 105 (1914); Baltimore Belt R.R. v. Baltzell, 75 Md. 94, 99, 23 A. 74 (1891)."

103, 311 A. 2d 242 (1973); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 300 A. 2d 367 (1973); *Potomac Sand & Gravel v. Governor*, 266 Md. 358, 293 A. 2d 241, *cert. denied*, 409 U. S. 1040, 93 S. Ct. 525, 34 L.Ed.2d 490 (1972); *Brooks v. State Board*, 233 Md. 98, 195 A. 2d 728 (1963); *Allied American Co. v. Comm'r*, 219 Md. 607, 150 A. 2d 421 (1959). Recent Supreme Court decisions in this area are *North Dakota Pharmacy Bd. v. Snyder's Stores*, 414 U..S. 156, 94 S. Ct. 407, 38 L.Ed.2d 379 (1973); *Ferguson v. Skrupa*, 372 U. S. 726, 83 S. Ct. 1028, 10 L.Ed.2d 93, 95 A.L.R.2d 1347 (1963); and *Williamson v. Lee Optical Co.*, 348 U. S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955).

Last term, in *Westchester West No. 2 v. Mont. Co., supra*, 276 Md. at 454-455, in holding that a Montgomery County rent control law did not violate the Due Process Clause of the Fourteenth Amendment or Art. 23 of the Maryland Declaration of Rights, we discussed the function of the courts in reviewing regulatory legislation alleged to be violative of the due process clauses. We emphasized that the function of the courts in this area is "very limited," and went on to say (276 Md. at 455):

> "Unless the exercise of the police power by the Legislature is shown to be arbitrary, oppressive or unreasonable, the courts will not interfere with it. *Bowie Inn v. City of Bowie, supra*, 274 Md. at 236; *Salisbury Beauty Schools v. St. Bd., supra*, 268 Md. at 48. Moreover, the wisdom or expediency of a law adopted in the exercise of the police power of a state is not subject to judicial review, and such a statute will not be held void if there are any considerations relating to the public welfare by which it can be supported. *Bowie Inn v. City of Bowie, supra*, 274 Md. at 236; *Sav-A-Lot, supra*, 270 Md. at 106; *Salisbury Beauty Schools v. St. Bd., supra*, 268 Md. at 48."

Judicial deference to legislative judgment is appropriate when reviewing legislation dealing with economic problems. In *Ferguson v. Skrupa, supra*, in holding constitutional a

statute permitting only attorneys to engage in the business of debt adjustment, the Supreme Court said (372 U. S. at 730-732, 83 S. Ct. at 1031-1032):

> "We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws. As this Court stated in a unanimous opinion in 1941, 'We are not concerned . . . with the wisdom, need, or appropriateness of the legislation.' Legislative bodies have broad scope to experiment with economic problems, and this Court does not sit to 'subject the State to an intolerable supervision hostile to the basic principles of our Government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to secure.' It is now settled that States 'have power to legislate against what are found to be injurious practices in their internal commercial and business affairs, so long as their laws do not run afoul of some specific federal constitutional prohibition, or of some valid federal law.'

\* \* \*

> " . . . We refuse to sit as a 'superlegislature to weigh the wisdom of legislation,' and we emphatically refuse to go back to the time when courts used the Due Process Clause 'to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought.' "

And as was said in *Williamson v. Lee Optical Co., supra,* 348 U. S. at 488, 75 S. Ct. at 464, quoted by us recently in *Steuart Petroleum Co. v. Board, supra,* 276 Md. at 447, the wisdom of the Act is not for us to judge as "[i]t is enough that there is

an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."

A statute enacted by the Legislature in the exercise of the police power "is presumed to be valid and one attacking its validity has the burden of affirmatively and clearly establishing its invalidity." *Salisbury Beauty Schools v. St. Bd., supra,* 268 Md. at 48. While the oil companies have presented evidence questioning the wisdom of the Act and perhaps raising doubts as to the efficacy of the Act in achieving its purpose of preserving a highly competitive retail gasoline market, they have failed to meet their burden. It has not been demonstrated that the Act is "arbitrary" or that there are no "considerations relating to the public welfare by which it can be supported." Quite to the contrary, the history of Chapter 854 establishes that it was the product of a careful and deliberate process involving a study of retail marketing of gasoline products in Maryland as well as three public hearings at which opponents of the Act, including some of those now challenging it, were able to present their objections to both the Legislature and the Governor.

The oil companies do not contend that the Legislature may not under any circumstances limit the nature of business which they may conduct in the state. *See, e.g., Daniel v. Family Ins. Co.,* 336 U. S. 220, 69 S. Ct. 550, 93 L. Ed. 632, 10 A.L.R.2d 945 (1949); *Asbury Hospital v. Cass County,* 326 U. S. 207, 66 S. Ct. 61, 90 L. Ed. 6 (1945); *Brooks v. State Board, supra.* Rather, the oil companies ask us to review the evidence concerning the *possible* effect of the Act and to substitute our judgment for that of the Legislature.

In *Bowie Inn v. City of Bowie, supra,* we were presented with a similar situation. There, the city council of Bowie, in order to control a problem of roadside litter, enacted an ordinance, after a public hearing, requiring a deposit to be collected on all soft drink and malt beverage containers which would be refunded upon return of the container. There, as here, those challenging the ordinance offered evidence that the ordinance would not be effective in

achieving its stated goal, and asked the Court to decide from such evidence that the city council acted arbitrarily and unreasonably. We rejected this contention in light of evidence presented to the city council that there was a need for litter control and in view of the fact that the means adopted by the city council could conceivably be effective in reducing the problem of litter.

Here the Legislature was presented with evidence that refiners and producers were favoring company operated stations in the allocation of gasoline. The Comptroller's report showed that, because of the inability to obtain adequate supplies of gasoline, some service station dealers were forced to close. Evidence was also presented that many dealer operated stations were being converted to company operation. The Legislature could reasonably conclude that control of the retail gasoline market by producers and refiners would decrease competition and that the continued existence of independent retail dealers was necessary to preserve competition.[4] Exclusion of producers and refiners may conceivably be a reasonable means of preserving competition and preventing monopolistic control of gasoline marketing by a few large oil companies. Divestiture of retail gasoline stations by producers and refiners as a means of preserving competition in retail gasoline marketing recently has been recommended by at least two congressional committees. See H. R. Rep. No. 94-1762, 94th Cong., 2d Sess. (1976); S. Rep. No. 94-1005, 94th Cong., 2d Sess. (1976). Indeed, in Federal Trade Comm'n v. Sun Oil Co., 371 U. S. 505, 528, 83 S. Ct. 358, 371, 9 L.Ed.2d 466 (1963), the Supreme Court recognized that elimination of retail service

---

4. The oil companies contend that the effect of the Act will be to reduce competition by excluding from the market certain aggressive competitors. The Legislature, however, has determined that competition from producers and refiners could ultimately result in the destruction of a competitive retail gasoline market. In Blum v. Engelman, 190 Md. 109, 115, 57 A. 2d 421 (1948), in upholding the validity of the Maryland Unfair Sales Act, this Court noted that certain competitive practices may be harmful to the public welfare, and that the Legislature is "free to adopt whatever economic policy may reasonably be deemed to promote public welfare, whether by promoting free competition by statutes aimed at monopolies or by curbing harmful competition . . . ." See also Goldsmith v. Mead Johnson & Co., 176 Md. 682, 7 A. 2d 176 (1939), which upheld the Maryland Fair Trade Act.

station dealers through forward vertical integration may be an "evil" requiring legislative action.

The oil companies have presented evidence which casts some doubt on the wisdom of the Act. The State's expert witness conceded that the Act, by excluding certain partially integrated marketers, could in some respects be anti-competitive, although he believed that it would, on the whole, promote competition. However, as discussed above, the courts may not substitute their judgment for that of the Legislature. Especially where reviewing legislation dealing with a serious problem in a new and untried fashion, the courts are under a special duty to respect the legislative judgment as to the proper means of solving the problem. Legislation prohibiting operation of retail service stations by producers and refiners of petroleum has been proposed in several states as well as in Congress but only recently has been enacted by several states. *See* Note, *Gasoline Marketing Divestiture Statutes: A Preliminary Constitutional and Economic Assessment,* 28 Vand. L. Rev. 1277 (1975). As of now there has been no evidence by which to judge the effects of these statutes and predictions as to the effects of the Act are at best speculative. In *Bowie Inn v. City of Bowie, supra,* we commented on the importance of permitting new legislation to be tested, as follows (274 Md. at 237-238):

> "Here, invalidation of the ordinance would deprive the City Council of Bowie and any other legislative body contemplating such a law of any opportunity to discover whether the ordinance will be good, bad or indifferent in its results. The words of Mr. Justice Frankfurter in *American Federation of Labor v. American Sash and Door Co.,* 335 U. S. 538, 553, 69 S. Ct. 258, 265, 93 L. Ed. 222, 6 A.L.R.2d 481 (1949) (concurring opinion), are particularly appropriate:
>
> > 'Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court

debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophesy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests — the people.' "

For these reasons, we hold that the court below erred in holding that the Act was violative of the Due Process Clause of the Fourteenth Amendment or Art. 23 of the Maryland Declaration of Rights.

### (2) *Commerce Clause*

The oil companies also contend that the divestiture provisions of the Act are invalid under the Commerce Clause, Art. I, § 8 of the United States Constitution. The companies argue that the purpose of the Act is to protect local retail service station operators from competition by those engaged in interstate commerce. To accomplish this purpose, it is contended that the Act denies out-of-state competitors access to local retail gasoline markets and thus discriminates against interstate commerce. In support of this contention, the oil companies rely on *H. P. Hood & Sons v. DuMond*, 336 U. S. 525, 69 S. Ct. 657, 93 L. Ed. 865 (1949).

The Supreme Court has on several occasions struck down state statutes regulating the production and sale of a commodity as violative of the Commerce Clause where it has found that the purpose and effect of the statute was solely to protect local economic interests by discriminating against interstate commerce. In *Baldwin v. G.A.F. Seelig*, 294 U. S. 511, 55 S. Ct. 497, 79 L. Ed. 1032, 101 A.L.R. 55 (1935), a New

York statute establishing a minimum price to be paiu out-of-state producers of milk to be sold locally was held unconstitutional. The Court found that the practical effect of the statute was to protect local producers from competition by excluding milk produced in other states from the New York market. Another New York statute was held unconstitutional in *H. P. Hood & Sons v. DuMond, supra*. There the statute granted the State Commissioner of Agriculture the authority to deny milk processors a license to operate milk receiving and processing plants if it were found that such plants would lead to "destructive competition in a market already adequately served." The petitioner, a milk processor who operated several receiving and processing plants in New York for milk to be sold in Massachusetts, was denied a license to operate a new facility. The Court determined that a license was denied to prevent exportation of milk from New York during a time when there was a temporary shortage of milk in the area in which the plant was to be located. Relying on the principle that the states may not "advance their own commercial interests by curtailing the movement of articles of commerce," the Court held that the statute as applied violated the Commerce Clause and was therefore unconstitutional. 336 U. S. at 535.

Similarly, in *Dean Milk Co. v. Madison*, 340 U. S. 349, 71 S. Ct. 295, 95 L. Ed. 329 (1951), the Court held unconstitutional a municipal ordinance which prohibited the sale of pasteurized milk in the city of Madison, Wisconsin, unless processed and bottled within a five mile radius of the center of town and which required that the source of supply of all milk be inspected by city officials, but which imposed a twenty-five mile limit on the area in which inspectors would travel. The petitioner was an Illinois corporation whose milk supply and processing plants were outside of the geographic limitations imposed by the ordinance. While recognizing that the city had a legitimate interest in protecting the health of its citizens by insuring that only wholesome milk be sold within its boundaries, the Court found that the ordinance, as in *Baldwin v. G.A.F. Seelig, supra*, had the

effect of excluding importation of wholesome milk produced out of state. Thus, the ordinance discriminated against interstate commerce by "erecting an economic barrier protecting a major local industry against competition from without the state" in violation of the Commerce Clause. 340 U. S. at 354.

A feature common to all three of these regulatory schemes was that they burdened the free flow of goods in commerce between the states by effectively hindering either the import or export of goods. And whether this burden on the movement of goods be direct and apparent on the face of the statute as in *Baldwin v. G.A.F. Seelig, supra,* or indirect as in *H. P. Hood & Sons v. DuMond, supra,* and *Dean Milk Co. v. Madison, supra,* the Court could conclude that the purpose and effect of the statute was primarily to protect a local industry by discriminating against interstate commerce. The Maryland statute here under consideration, however, differs in several substantial ways.

*First,* Chapter 854 would not in any way restrict the free flow of petroleum products into or out of the state. The Act merely regulates a wholly intrastate activity, the retail marketing of gasoline within the state. Producers and refiners would still remain free to import and sell petroleum products to wholesalers and to retail service station dealers. The only restriction is that producers and refiners may not operate retail service stations in Maryland with their own employees but must do so with retail service station dealers.

*Second,* although the oil companies contend that the purpose of the Act was to protect local economic interests from the competition of oil companies engaged in interstate commerce, in view of the legislative history of the Act we cannot agree with this contention. There is every indication that the purpose of the statute was to preserve competition within the retail gasoline marketing industry in Maryland. As previously discussed, the Comptroller's report, as well as other evidence presented to the Legislature, indicated that company operated stations received greater allocations of gasoline during a period of shortage than did dealer operated stations, forcing many dealers out of business. Moreover,

there was evidence that the oil companies intended to increase the number of company operated stations. The General Assembly, after considering the activities of producers and refiners in the industry, concluded, as have several congressional committees, that the recent trend of increased direct operation of service stations by producers and refiners, if allowed to continue, could substantially decrease competition and lead to the control of that market by a few major oil companies. *See* H. R. Rep. 94-1762, 94th Cong., 2d Sess. 28 (1976); H. R. Rep. No. 1423, 84th Cong., 1st Sess. 17 (1955). Thus, the purpose was not to protect Maryland interests from out-of-state competition.

*Finally,* the Act does not in effect discriminate against out-of-state economic interests as opposed to local interests. The Act is equally applicable to all producers and refiners. While oil is not produced in Maryland, and is not presently being refined in Maryland, there are producers or refiners which are Maryland corporations, or are headquartered here, or have substantial facilities here, or do a significant portion of their business here. All such "Maryland" businesses are prohibited by the Act from operating retail service stations. If a refiner were to build refineries in Maryland, and were to engage in business solely within Maryland, it would be prohibited by the Act from marketing through a company operated station. On the other hand, out-of-state and Maryland retailers are treated the same. An out-of-state marketer not engaged in producing or refining may continue to market in Maryland through retail service stations operated with company personnel.

The only Supreme Court case of which we are aware which considers a challenge to a state divestiture statute on Commerce Clause grounds is *Crescent Oil Co. v. Mississippi,* 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166 (1921).[5] There, a

5. *See also* Paramount Pictures v. Langer, 23 F. Supp. 890, 895 (D. N.D. 1938), *remanded with directions to dismiss on grounds of mootness,* 306 U. S. 619, 59 S. Ct. 641, 83 L. Ed. 1025 (1939), where a statute prohibiting the operation of motion picture theaters in the state of North Dakota which were owned, controlled, or managed by producers or distributors of motion picture films was held not to violate either the due process clause or the equal protection clause of the Fourteenth Amendment or the Commerce Clause.

Mississippi statute prohibited both out-of-state and Mississippi corporations engaged in the manufacture of cotton seed oil or cotton seed meal from owning or operating cotton gins. It was argued that the statute was enacted because the legislature believed that manufacturers of cotton seed oil or meal, if also allowed to operate cotton gins, would depress the price charged for ginning in order to suppress competition in the ginning industry. The petitioner contended that the statute imposed a direct and unconstitutional burden on interstate commerce. The Court rejected this contention, pointing out that the statute regulated only a manufacturing process conducted within the state.

In holding in *Crescent Oil* that the Mississippi statute did not violate the Commerce Clause, the Supreme Court noted that the activity to be regulated was intrastate manufacturing and not interstate commerce. While we recognize that the distinction between "manufacturing" and "commerce" is no longer the test of *congressional* power to regulate activities under the Commerce Clause, *Wickard v. Filburn*, 317 U. S. 111, 63 S. Ct. 82, 87 L. Ed. 122 (1942), it may be of some significance in determining a *state's* authority. The fact that Congress may regulate in this area does not necessarily result in the loss of the state's power to regulate an intrastate activity which may possibly have some effect on interstate commerce. The Supreme Court, in *Cities Service Co. v. Peerless Co.*, 340 U. S. 179, 186-187, 71 S. Ct. 215, 219-220, 95 L. Ed. 190 (1950), stated:

"The Commerce Clause gives to the Congress a power over interstate commerce which is both paramount and broad in scope. But due regard for state legislative functions has long required that this power be treated as not exclusive. *Cooley v. Port Wardens*, 12 How. 299 (1851). It is now well settled that a state may regulate matters of local concern over which federal authority has not been exercised, even though the regulation has some impact on interstate commerce. *Parker v. Brown*,

317 U. S. 341 (1943); *Milk Control Board v. Eisenberg Farm Products,* 306 U. S. 346 (1939); *South Carolina Highway Dept. v. Barnwell Bros.,* 303 U. S. 177 (1938). The only requirements consistently recognized have been that the regulation not discriminate against or place an embargo on interstate commerce, that it safeguard an obvious state interest, and that the local interest at stake outweigh whatever national interest there might be in the prevention of state restrictions. Nor should we lightly translate the quiescence of federal power into an affirmation that the national interest lies in complete freedom from regulation. *South Carolina Highway Dept. v. Barnwell Bros., supra.*"

*See also Huron Cement Co. v. Detroit,* 362 U. S. 440, 443-444, 80 S. Ct. 813, 4 L.Ed.2d 852, 78 A.L.R.2d 1294 (1960); *Breard v. Alexandria,* 341 U. S. 622, 634, 71 S. Ct. 920, 95 L. Ed. 1233, 35 A.L.R.2d 335 (1951); *Panhandle Co. v. Michigan Comm'n,* 341 U. S. 329, 71 S. Ct. 777, 95 L. Ed. 993 (1951); *Bowie Inn v. City of Bowie, supra,* 274 Md. at 244-245.

More recently, the Court has indicated that in determining the validity of a state statute affecting interstate commerce, a balancing of the state interest involved in relation to the burden imposed upon interstate commerce may sometimes be appropriate. This "weighing test" was described in *Pike v. Bruce Church, Inc.,* 397 U. S. 137, 142, 90 S. Ct. 844, 25 L.Ed.2d 174 (1970), as follows:

"Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. *Huron Cement Co. v.*

*Detroit,* 362 U. S. 440, 443. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities. Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, *Southern Pacific Co. v. Arizona,* 325 U. S. 761, but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens. See, *e.g., Shafer v. Farmers Grain Co., supra* [268 U. S. 189]."

Applying these principles, we conclude that the divestiture provisions of the Act do not violate the Commerce Clause. The Act does not discriminate against interstate commerce as all producers and refiners, whether in or out of the state, are affected equally. The promotion of the economic welfare is a legitimate interest of a state, *Pike v. Bruce Church, Inc., supra,* 397 U. S. at 143; *Parker v. Brown,* 317 U. S. 341, 363, 63 S. Ct. 307, 87 L. Ed. 315 (1943), and it has long been recognized that the states have the power to pass legislation to promote competition by preventing monopolistic activity in restraint of trade, *Watson v. Buck,* 313 U. S. 387, 403-404, 61 S. Ct. 962, 85 L. Ed. 1416, 136 A.L.R. 1426 (1941); *Waters-Pierce Oil Co. v. Texas* (No. 1), 212 U. S. 86, 107, 29 S. Ct. 220, 53 L. Ed. 417 (1909).

The record, on the other hand, fails to establish that the Act will, to a significant degree, burden interstate commerce. The allegations of the oil companies that the restrictions placed on producers and refiners will limit the availability of products and services to those traveling in interstate commerce is, at best, highly speculative. *Bowie Inn v. City of Bowie, supra.* Most of the producers and refiners have in the past operated only a small percentage of the retail service stations which they supply. The vast majority of retail service stations in Maryland, supplying

both interstate and intrastate travelers, are operated by independent dealers.[6] It is true that three of the oil companies involved in this action do market exclusively through company operated stations,[7] and officials of these companies indicated at trial that they might be forced to withdraw from the Maryland market if the Act were to become effective. However, at least two of these company witnesses on cross-examination indicated that no firm decision had been made to withdraw if the Act were to become effective, and that it still might be possible to distribute products in Maryland both through dealer operations and on the wholesale market. It therefore appears that there will be no significant disruption of the flow of petroleum products into the state nor in the distribution of those products to those in interstate commerce. We believe that the state's interest, as determined by the Legislature, outweighs any slight burden which the Act may impose on interstate commerce.

For all of the above reasons, the divestiture provisions of the Maryland Act are not unconstitutional under the Commerce Clause.

### (3) *Unconstitutional Taking*

The trial court held that the divestiture provisions of the Act constitute a taking of private property without just compensation, in violation of Art. III, § 40 of the Maryland Constitution and the just compensation clause of the Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment.

For government restriction upon the use of property to

---

6. For example, according to facts stipulated by the parties, as of July 1, 1974, of the 632 stations affiliated with Exxon Corporation in the state of Maryland, only 36 were company operated. Similarly, only 1 of 219 stations affiliated with Gulf Oil Corporation was company operated. Phillips Petroleum Company, with 131 Maryland stations, operated only 13 with company personnel. Shell Oil Company had 284 Maryland affiliated stations, but only 1 was company operated. Texaco, Incorporated, which had 307 affiliated stations in Maryland as of July 1, 1974, had no station operated with company personnel.

7. Ashland Oil, Inc.; Kayo Oil Company; Petroleum Marketing Corporation. As of July 1, 1974, Ashland had 19 stations in Maryland; Kayo, 16 stations; and Petroleum Marketing Corporation, 21 stations.

constitute a taking in the constitutional sense, so that compensation must be paid, the restriction must be such that it essentially deprives the owner of all beneficial uses of his property. As this Court stated in *Baltimore City v. Borinsky*, 239 Md. 611, 622, 212 A. 2d 508 (1965):

> "The legal principles whose application determines whether or not the restrictions imposed . . . on the property involved are an unconstitutional taking are well established. If the owner affirmatively demonstrates that the legislative or administrative determination deprives him of all beneficial use of the property, the action will be held unconstitutional. But the restrictions imposed must be such that the property cannot be used for any reasonable purpose. It is not enough for the property owners to show that the . . . action results in substantial loss or hardship."

*Goldblatt v. Hempstead*, 369 U. S. 590, 592, 82 S. Ct. 987, 8 L.Ed.2d 130 (1962); *United States v. Central Eureka Mining Co.*, 357 U. S. 155, 168, 78 S. Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958); *Bureau of Mines v. George's Creek*, 272 Md. 143, 165, 321 A. 2d 748 (1974); *Rockville v. Stone*, 271 Md. 655, 663-664, 319 A. 2d 536 (1974).

The Maryland Act, in prohibiting producers and refiners from directly operating retail service stations, clearly does not constitute a "taking" in the constitutional sense. The divestiture provisions of the Act do not deprive producers and refiners owning retail service stations of all beneficial uses of their property, or even of the existing and presumably most profitable use of their property. As previously discussed, the majority of retail service stations are now operated by dealers and not employees. Thus the Act will have less impact, for example, than the zoning provisions upheld in *Goldblatt v. Hempstead, supra*, or *Baltimore City v. Borinsky, supra*, which deprived the owners of the most profitable use of the property. The relatively few service stations directly operated by producers and refiners may continue to be used as service

stations, as producers and refiners may lease the property to dealers. The Maryland Act does not prohibit an oil company from owning a retail service station or having the station operated as a retail outlet for that company's products. It merely requires that the station be operated by a retail dealer rather than by company employees.

Moreover, allowance for the temporary operation by refiners and producers, as well as reasonable exceptions to the divestiture dates, as provided by the Act in Paragraphs G and H, will also lessen the impact of the divestiture provisions on producers and refiners.

In sum, the restrictions imposed by the divestiture provisions of the Act on the manner in which oil companies may continue to use their property for retail service station purposes, *i.e.*, using retail dealers instead of employees, does not amount to a "taking" of private property in violation of the federal or state constitutions.

### (4) *Equal Protection*

The oil companies argue, and the trial court held, that the divestiture provisions of the Act constitute a denial of the equal protection of the laws in that they prohibit only producers and refiners of petroleum products from operating retail service stations while permitting "wholesalers, mass merchandisers, food retailers, and gasoline marketers" to operate retail service stations. It is claimed that the classification is arbitrary and without any rational basis.[8]

---

8. The oil companies, both at trial and on appeal, contend that the Act deprives them of the equal protection of the laws in violation of both the Fourteenth Amendment to the United States Constitution and the Due Process Clause, Art. 23, of the Maryland Declaration of Rights. The Maryland Constitution does not contain an express equal protection clause as does the Fourteenth Amendment. The trial court's equal protection holding was apparently premised upon the Due Process Clause of the Maryland Declaration of Rights. For the purposes of appeal, we shall assume that the Due Process Clause, Art. 23, embodies the concept of equal protection. Bruce v. Dir., Chesapeake Bay Aff., 261 Md. 585, 600, 276 A. 2d 200 (1971); Celanese Corporation v. Davis, 186 Md. 463, 471-472, 47 A. 2d 379 (1946). *Cf.* Bolling v. Sharpe, 347 U. S. 497, 74 S. Ct. 693, 98 L. Ed. 884 (1954). We shall further assume that the standard of review under both the Maryland Constitution and the Equal Protection Clause of the Fourteenth Amendment is the same where economic regulation is challenged on equal protection grounds.

The proper standard of review when economic regulation is challenged as violating the Equal Protection Clause of the Fourteenth Amendment has been most recently discussed by the Supreme Court in *City of New Orleans v. Dukes*, 427 U. S. 297, 96 S. Ct. 2513, 2516-2517, 49 L.Ed.2d 511 (1976):

"Unless a classification trammels fundamental personal rights or is drawn upon inherently suspect distinctions such as race, religion, or alienage, our decisions presume the constitutionality of the statutory discriminations and require only that the classification challenged be rationally related to a legitimate state interest. States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude. . . . In short, the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines, see, *e.g., Day-Brite Lighting, Inc. v. Missouri*, 342 U. S. 421, 423, 72 S. Ct. 405, 407, 96 L.Ed. 469 (1952), in the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment."

If the classification is not purely arbitrary and has a rational basis, the statute does not violate the Equal Protection Clause. *McGowan v. State of Maryland*, 366 U. S. 420, 425-428, 81 S. Ct. 1101, 1104-1106, 6 L.Ed.2d 393 (1961); *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 78-79, 31 S. Ct. 337, 55 L. Ed. 369 (1911); *Bowie Inn v. City of Bowie, supra*, 274 Md. at 240-241; *Adm'r, Motor Veh. Adm. v. Vogt*, 267 Md. 660, 670-678, 229 A. 2d 1 (1973); *Brooks v. State Board, supra*, 233 Md. at 114-115. Moreover, a statutory classification will not be held to violate the equal protection clause if there exists any state of facts which reasonably can be conceived to sustain it. *Davidson v. Miller*, 276 Md. 54,

69-70, 344 A. 2d 422 (1975); *Matter of Trader*, 272 Md. 364, 391-392, 325 A. 2d 398 (1974).

The statutory distinction between producers and refiners on the one hand, and other sellers of petroleum products on the other, is not arbitrary. As discussed previously, the Legislature determined that prohibiting producers and refiners from operating retail service stations was necessary to preserve competition. Furthermore, the Legislature may well have determined that discrimination against retail service station dealers and in favor of company operated stations, in the distribution of petroleum products, was an evil which could be cured by preventing producers and refiners from operating retail service stations. Thus, the classification bears a rational relationship to the objective of the Act of preserving competition and fairness within the Maryland retail gasoline marketing industry. Consequently, there is no merit to the oil companies' argument that the Act denies them the equal protection of the laws.

### (5) *Unlawful Delegation*

The contention that Paragraphs G and H of the Act constitute an unlawful delegation of legislative authority in violation of Art. 8 of the Maryland Declaration of Rights is also without merit. Ordinarily when legislative authority is delegated to administrative officials, tnere must be sufficient standards for the guidance of the administrative officials. However, it has been recognized that the complexity of modern economic conditions may make it impossible to tailor specific guidelines for every conceivable situation and that latitude in granting discretion is necessary. As stated in *Pressman v. Barnes*, 209 Md. 544, 555, 121 A. 2d 816 (1956):

"It is recognized that it would not always be possible for Legislature or City Council to deal directly with the multitude of details in the complex situations upon which it operates. . . . The modern tendency of the courts is toward greater

liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases."

See also Montgomery County v. Walsh, 274 Md. 502, 523-524, 336 A. 2d 97 (1975), appeal dismissed, 424 U. S. 901, 96 S. Ct. 1091, 47 L.Ed.2d 306 (1976). It would obviously be impractical for the Legislature to set specific guidelines to govern all situations where exceptions to the divestiture dates would be reasonable or where it would be necessary for a producer or refiner to operate a service station on a temporary basis. This grant of authority to the Comptroller is necessary and is constitutional.

### (6) Conflict with the Federal Emergency Petroleum Allocation Act

The trial court held that Paragraph F of the Maryland Act conflicts with and is therefore preempted by the Federal Emergency Petroleum Allocation Act of 1973.

Paragraph F of the Act provides that during periods of shortages, producers, refiners and wholesalers shall "apportion uniformly" gasoline and special fuels (which, as defined in Art. 56, § 157A (2), includes diesel oils) to all retail service station dealers "on an equitable basis" and "shall not discriminate among the dealers in their allotments." In view of the history of the Act, it is clear that the Legislature by this provision intended to prevent the inequitable distribution of petroleum products, reflected by the Comptroller's study, which occurred during periods when a particular supplier had insufficient supplies to satisfy its dealers' requirements. To prevent a supplier from favoring one dealer over another during a period when the supplier was experiencing a shortage, the Act requires that the available product be alloted to each dealer on the same basis. In other words, when supplies are insufficient to meet dealer requirements, there must be a pro rata reduction to each dealer.

In its fundamental purpose, Paragraph F of the Maryland Act is in harmony with the. Emergency Petroleum Allocation Act, 15 U.S.C. 751 *et seq.* The federal act provides for the promulgation of regulations for the allocation of, *inter alia,* refined petroleum products. 15 U.S.C. 753. The federal act goes on to state that the regulations, to the "maximum extent practicable," shall provide for the "equitable distribution of . . . refined petroleum products . . . among all . . . sectors of the petroleum industry, including . . . non branded independent marketers, [and] branded independent marketers . . . ." 15 U.S.C. 753(b)(1)(F). To achieve this objective of equitable distribution, the federal act further states that regulations should provide, where practicable, for a pro rata reduction in allocation to each branded and unbranded independent marketer where there is insufficient product to supply each with the amounts supplied in a prior corresponding base period. 15 U.S.C. 753(c)(1)(A). As originally enacted, the President's authority to promulgate regulations was to terminate on February 28, 1975. This authority has been extended several times, and has been extended most recently to September 30, 1981, by Pub. L. No. 94-163, § 461 (1975).

By its express terms, the federal Emergency Petroleum Allocation Act preempts only such state regulations of allocation of refined petroleum products which are in actual conflict with regulations promulgated pursuant to it. Thus, 15 U.S.C. 755(b) provides that:

> "The regulation under section 753 of this title and any order issued thereunder shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any State or local government if such provision is in conflict with such regulation or any such order."

Therefore we need not determine whether the existence of a comprehensive system of federal regulation necessarily precludes state regulation, as Congress has specifically limited the type of state regulation which is preempted. We

need only determine whether Paragraph F of the Maryland statute conflicts with any regulation promulgated pursuant to the Emergency Petroleum Allocation Act.

The federal regulations promulgated pursuant to the federal act establish a scheme of equitable petroleum allocation. Each supplier must determine its "allocation fraction" which is "equal to its allocable supply . . . divided by its supply obligation . . . ." 10 C.F.R. § 211.10(b). This fraction is then applied to each purchaser's "base period volume" to determine the purchaser's allocation. In other words, each purchaser is allocated petroleum products based upon the seller's total supplies relative to the seller's total obligations. Where the allocation fraction is less than one, that is, where a supplier's allocable supply is less than his supply obligation for a base period, the supplier must reduce on a *pro rata basis* the amounts sold to purchasers. 10 C.F.R. § 211.10(f). This scheme is applicable to the allocation of motor gasoline, 10 C.F.R. § 211.107(b), as well as diesel fuel, 10 C.F.R. § 211.126(b), and as discussed above, is entirely consistent with Paragraph F of the state Act.

The Maryland Act requires that gasoline and special fuels be apportioned "uniformly," on "an equitable basis" to all retail service station dealers during a period of shortage.

The oil companies, in arguing that Paragraph F of the Maryland statute is in conflict with the federal regulatory scheme, point to several factors affecting allocations under the federal regulations which may allow allocation on other than a "uniform" basis which they contend is required by Paragraph F. *See, e.g.,* 10 C.F.R. § 211.14(b), permitting a 5% reduction in monthly allocable supply to an area within a state to meet regional imbalances. We do not believe that the Legislature, in requiring that petroleum products be apportioned "uniformly," intended that the Comptroller could not take into account, as do the federal regulations, other factors affecting allocation and distribution of petroleum products which might result in varying allocations to certain dealers. Although petroleum products are to be apportioned "uniformly," allocation is also to be on an "equitable basis." By thus modifying "uniformly," it

would appear that the Legislature contemplated that certain equitable factors might require variations in an otherwise uniform scheme of gasoline and special fuel allocation.

Consequently, we do not find that Paragraph F of the Maryland statute inherently conflicts with any regulation pursuant to the Emergency Petroleum Allocation Act of 1973. We find that Paragraph F is in harmony with the Emergency Petroleum Allocation Act which expressly preserves the power of the states to regulate the allocation of refined petroleum products. As the State concedes, the Comptroller may not order allocation of petroleum products in conflict with the federal regulations enacted pursuant to the Emergency Petroleum Allocation Act or promulgate regulations pursuant to Art. 56, § 157B (a) which would conflict with present or future federal regulations. *Cf. Rice v. Board of Trade of City of Chicago*, 331 U. S. 247, 67 S. Ct. 1160, 91 L. Ed. 1468 (1947). However, enforcement of the provisions in accordance with federal standards would be proper.

### (7) *Conflict with the Robinson-Patman Act*

Before the trial in this case commenced, the circuit court granted a motion for partial summary judgment filed by Exxon, Shell and Gulf regarding Paragraph D of the Maryland Act which requires that suppliers extend "voluntary allowances" uniformly to all retail service station dealers supplied. The trial court held that Paragraph D is in conflict with § 2 of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13, and is therefore invalid under the Supremacy Clause, Art. VI of the United States Constitution.

Section 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, 15 U.S.C. 13(a), provides in part that "[i]t shall be unlawful for any person . . . to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition . . . ." However, § 2(b) of the same Act, 15 U.S.C. 13(b), provides a seller with a defense to a charge of price

discrimination "by showing that his lower price ... to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor ...." The oil companies contend, and the court below held, that in requiring that voluntary allowances be extended to all retail service stations within the state, the state Act deprives sellers of a federal right to discriminate in price between purchasers where necessary to meet an equally low price of a competitor as provided by § 2(b) of the federal act.

In determining whether a conflict exists between Paragraph D of Ch. 854 and § 2(b) of the Clayton Act, as amended by the Robinson-Patman Act, it is necessary both to determine the meaning of "voluntary allowances" as used in Paragraph D of the state statute and to ascertain the scope of the "meeting competition" defense in § 2(b) of the federal statute.

Turning to the meaning of "voluntary allowances" in Paragraph D, where a term used in a statute relating to a particular trade or industry does not have a common usage, then the term is presumed to be used in the commercial sense. As was said in *Armco Steel v. State Tax Comm.*, 221 Md. 33, 41-42, 155 A. 2d 678 (1959):

> "When terms in a statute are used relating to trade or commerce, absent legislative intent to the contrary, the terms are presumed to be used in their trade or commercial meaning. 2 Sutherland, *Statutory Construction*, § 4919 (3d ed. 1943).... [I]t must be presumed that [the Legislature] possessed at least the common knowledge about that industry."

*See also Perdue v. St. Dep't of Assess. & T.*, 264 Md. 228, 234-235, 286 A. 2d 165 (1972).

The State asserts that a "'voluntary allowance' is oil industry jargon for a rebate of a portion of the otherwise uniform 'tank wagon (wholesale) price' paid by all dealers of a particular brand for their gasoline." (Appellants' brief, p. 40.) The Comptroller's report also defined voluntary allowances as discounts extended by suppliers to certain

dealers to enable those dealers to meet competition. The oil companies do not disagree with the State's definition of "voluntary allowances." [9] In fact, affidavits filed by the oil companies in support of the motion for partial summary judgment, as well as stipulations of facts, support the State's position. Thus, an affidavit filed by a Shell marketing manager states:

> "Under specified market conditions, Shell grants temporary price reductions, or 'competitive allowances,' to its branded retail dealers. Shell's purpose in granting competitive allowances is to provide competitive and equitable assistance in gasoline prices to Shell dealers who are injured by local competitive gasoline price reductions of competing retailers which are subsidized by their suppliers."

To similar effect are affidavits filed by Exxon and Gulf.

This definition of "voluntary allowances" is supported by congressional reports dealing with the retail marketing of gasoline. The practice of granting temporary price reductions in the wholesale price to selected dealers to "meet competition" has long been in use and has been criticized in congressional reports as a means of controlling price competition in small, localized areas. In hearings before the Senate Select Committee on Small Business investigating a gasoline price war, one major oil company official described "voluntary allowances" as

> "a method of extending price assistance to an individual dealer to assist him in meeting price competition with which he is faced, to aid him in maintaining volume, and to help him, as an independent businessman, stay in business and protect his investment. *At the same time, because*

---

9. The oil companies, however, do contend that the term "voluntary allowances" is unconstitutionally vague in that it may refer to other types of assistance extended to dealers such as rent relief in certain situations. For the reasons to be discussed below, we do not find that "voluntary allowances" as used in Paragraph D encompasses such a broad spectrum of dealer assistance and is limited to certain price discounts.

*of its application to dealers on an individual basis, the plan tends to help localize the price disturbance."* S. Rep. No. 2810, 84th Cong., 2d Sess. 19 (1956). (Emphasis supplied.)

*See also* H. R. Rep. No. 1423, 84th Cong., 1st Sess. 12-17 (1955). There, as here, the practice of granting voluntary allowances to dealers to enable those dealers to meet the price competition of other dealers was justified by the oil companies as being permissible price discrimination within the § 2(b) defense. S. Rep. No. 2810, 84th Cong., 2d Sess. 20.

Finally, in addition to the statements of the parties and the congressional reports, the legislative history of the Maryland statute confirms that the term "voluntary allowances" as used in Paragraph D refers to the pricing practices described by the oil companies. The Comptroller's report refers to the practice of temporary, selective price reductions, and indicates that the amount of these reductions varied considerably. The statement of an oil company executive at the hearings conducted by the Senate Economic Affairs Committee and the House Economic Matters Committee on the Act denies that price assistance is not offered on an equitable basis and takes the position that selective, localized price reductions are necessary and beneficial to dealers. Consequently, it appears that Paragraph D was intended to prevent the practice of localized price discounts, the Legislature believing that all retail service station dealers of the same brand should be treated equally. This is consistent with other provisions of the Act which are intended to eliminate discrimination against retail dealers by their suppliers.

Therefore, in view of the principle of statutory construction that terms relating to a particular industry are presumed to be used in their commercial sense in the absence of any common meaning to the contrary, and in light of industry practices and legislative history, we construe "voluntary allowances" to mean temporary price reductions in the wholesale price to a retail dealer to enable the dealer to meet the lower price of a competing retail dealer.

The oil companies do not argue that Paragraph D is in general conflict with the Robinson-Patman Act. Rather their contention is based solely upon the availability of the § 2(b) defense where temporary price reductions are granted to a dealer to enable the dealer to meet the competition of another dealer. Such competition at the retail level would occur basically in two situations. Either a competing retail dealer would lower its price on its own or a competing retailer would lower its price after receiving a reduction in the wholesale price from its supplier. We must determine, then, whether the § 2(b) defense would be available if a voluntary allowance were granted to a retail dealer to meet either one of these competitive situations.

It is settled that the § 2(b) defense is not available to a supplier where a discriminatory price cut is granted to a dealer to enable that dealer to respond to a competing dealer's price cut where the competing dealer does not receive a price cut from its supplier. In *Federal Trade Comm'n v. Sun Oil Co., supra*, 371 U. S. at 505, 83 S. Ct. at 358, Sun Oil Company granted a discriminatory price reduction to one of its retail dealers to enable that dealer to meet the lower price of a retail competitor. There was no showing that the lower price of the retail competitor was supported by an enabling price cut from its own supplier, and therefore the Court assumed that the retail competitor was unaided by its supplier. The Court held that the § 2(b) "good faith meeting competition" defense was not available to the supplier, as that defense applies only where the seller's reduction in price is made to meet "the lower price of his own competitor" and not the lower price of his customer's competitor. 371 U. S. at 529.

However, the Supreme Court in *Federal Trade Comm'n v. Sun Oil Co., supra*, 371 U. S. at 512 n. 7, 83 S. Ct. at 363 n. 7, specifically reserved the question of whether the § 2(b) defense is available if the seller's discriminatory price cut to its dealer is in response to a price cut made by a competitor of the seller to the competitor's dealer. There is a conflict in the lower federal courts on this question. In *Enterprise Industries v. Texas Company*, 136 F. Supp. 420, 421 (D.

Conn. 1955), *reversed on other grounds*, 240 F. 2d 457 (2d Cir.), *cert. denied*, 353 U. S. 965, 77 S. Ct. 1049, 1 L.Ed.2d 914 (1957), the court held that the § 2(b) defense is available to a supplier only where the discriminatory price is offered to a buyer in response to an equally low price offered *to that same buyer* by a competitor of the supplier. In other words, the § 2(b) defense is available only where the discriminatory price reduction is offered to retain a customer in the face of a "price raid" on that customer by a competitor of the seller. In *Bargain Car Wash, Inc. v. Standard Oil Co. (Indiana)*, 466 F. 2d 1163, 1175 (7th Cir. 1972), on the other hand, the court held that the defense is available if the supplier's lower price is offered to its dealer to meet the equally low price offered by a competitor of the supplier to its dealer. The court relied on the Federal Trade Commission's most recent interpretation of § 2(b) as announced in the Commission's *Report on Anti-Competitive Practices in the Marketing of Gasoline*, 3 Trade Reg. Rep., ¶ 10,373 at 18,245 (1967), where the Commission reversed its position on § 2(b) and abandoned its support of the *Enterprise* holding on which it had relied in *Federal Trade Comm'n v. Sun Oil Co., supra. See* Note, *Gasoline Marketing and the Robinson-Patman Act*, 82 Yale L. J. 1706, 1713 n. 44 (1973).

Although the question is not without doubt, based upon the limited nature of the § 2(b) defense and the purposes of the Robinson-Patman Act as discussed in *Federal Trade Comm'n v. Sun Oil Co., supra*, and *Standard Oil Co. v. Trade Comm'n*, 340 U. S. 231, 71 S. Ct. 240, 95 L. Ed. 239 (1951), we agree with the interpretation of § 2(b) set forth in *Enterprise Industries v. Texas Company, supra*. As the Court observed in *Federal Trade Comm'n v. Sun Oil Co., supra*, the purpose of the Robinson-Patman Act was "to obviate price discrimination practices threatening independent merchants and businessmen . . . ." 371 U. S. at 520, 83 S. Ct. at 367. To accomplish this goal, the Robinson-Patman Act amended the Clayton Act to limit the § 2(b) defense to only those situations where the discriminatory price was offered "to meet an equally low price of a competitor." Prior to the Robinson-Patman Act, a

defense was available where the discriminatory price concession "was made in good faith to meet competition." The House Committee in its report on the Act, said of this revision (H. R. Rep. No. 2287, 74 Cong., 2d Sess. 16 (1936)):

"This proviso represents a contraction of an exemption now contained in section 2 of the Clayton Act which permits discriminations without limit where made in good faith to meet competition. It should be noted that while the seller is permitted to meet local competition, it does not permit him to cut local prices *until his competition has first offered lower prices,* and then he can go no further than to meet those prices. If he goes further, he must do so likewise with all his other customers, or make himself liable to all of the penalties of the act, including treble damages. In other words, the proviso permits the seller to meet the price actually previously offered by a local competitor. It permits him to go no further." (Emphasis supplied.)

This, in combination with the qualified wording of the § 2(b) defense when compared with the more expansive prohibition against price discrimination contained in § 2(a), led the Supreme Court to conclude that the defense was available only where the grantor of the discriminatory price was responding to price competition at his own level and not that at the level of the buyer who receives the discriminatory price. 371 U. S. at 514-515, 83 S. Ct. at 364-365.

Although the Court in *Sun Oil Company* did not decide if the § 2(b) defense is available only where two sellers are competing for the same customer, it did observe that this is the "more normal circumstance" where the § 2(b) defense is applicable. 371 U. S. at 526. *See, e.g., Krieger v. Texaco, Inc.,* 373 F. Supp. 108 (W.D. N.Y. 1973). The purpose of the § 2(b) defense was discussed in these terms in *Standard Oil Co. v. Trade Comm'n, supra,* 340 U. S. at 249-250, where the Court stated that the § 2(b) defense is available to a seller to prevent a "price raid" by permitting a seller "to retain a customer by real-

istically meeting in good faith the price offered to that customer, without necessarily changing the seller's price to its other customers." To expand the § 2(b) defense beyond this situation, allowing a supplier selectively to reduce its price to a dealer where that dealer faces competitive piessures from another retail dealer aided by lawful reductions from its supplier, would frustrate the overall purpose of antitrust laws to promote competition. Selective price discounts allow sellers to suppress competition, especially from independent, non-branded dealers, in a relatively small area without offering lower prices on a more generalized basis. The use of voluntary allowances to enable petroleum suppliers to inhibit rather than foster competition has been recognized in studies on the retail marketing industry. H. R. Rep. No. 1423, 84th Cong., 1st Sess. 12017; S. Rep. No. 2810, 84th Cong., 2d Sess. 19023. As the Supreme Court said in *Federal Trade Comm'n v. Sun Oil Co.*, *supra*, 371 U. S. at 523, 83 S. Ct. at 369, "[s]o long as the wholesaler can meet challenges to his pricing structure by wholly local and individualized responses, it has no incentive to alter its overall pricing policy." [10] Commentators have also concluded that to expand the § 2(b) defense to permit petroleum suppliers to extend localized, discriminatory price cuts to a retail dealer to enable that dealer to meet the lower price of a competing retail dealer, which is subsidized by a price cut by the supplier's competitor, would be inconsistent with the purpose and legislative history of the Robinson-Patman Act. Note, *Gasoline Marketing and the Robinson-Patman Act, supra; The Supreme Court, 1962 Term*, 77 Harv. L. Rev. 81, 173-176 (1963).

Consequently, we believe that the § 2(b) defense is available only where the discriminatory price reduction is to meet the equally low price offered to *the same buyer* by a

---

10. As the Court suggested in Federal Trade Comm'n v. Sun Oil Co., *supra*, 371 U. S. at 526, 83 S. Ct. at 370, sellers may, as an alternative to selective, discriminatory price cuts, reduce wholesale prices over a wider competitive area "so as to preclude the probable incidence of the substantial anticompetitive effects upon which [a] violation of § 2(a) is ... grounded."

competing seller. The oil companies, by relying on *Cadigan v. Texaco, Inc.*, 492 F. 2d 383 (9th Cir. 1974), seem to suggest that even in this situation, where a discriminatory price reduction is offered to a dealer to meet an equally low price offered to that same dealer by a competing supplier, Paragraph D of the Maryland Act would require that the discount be offered to all retail service station dealers supplied. However, we have construed "voluntary allowances" in the state Act to mean only those price reductions offered to retail dealers to enable the dealer to meet the lower price of a *competing retail dealer.* Thus, there is no conflict between Paragraph D and § 2(b) of the Clayton Act as amended by the Robinson-Patman Act. Paragraph D of the state Act encompasses only the situation where temporary price reductions are given to a dealer to meet the lower price of a *competing dealer,* and, in our view, § 2(b) of the federal Act does not extend to that situation.

Moreover, even if the Legislature were to extend the concept of "voluntary allowances" to include the situation where a price reduction is offered to a retail dealer to meet the equally low price offered to that *same dealer* by a competing supplier, there has been no suggestion that such a situation occurs with any frequency in the oil industry. Consequently, in most situations where temporary price reductions are extended, there would be no conflict between the Maryland statute and the federal statute. If, however, a conflict did arise, the Maryland statute would be preempted only to the extent necessary to avoid the conflict and not in its entirety as the oil companies suggest. *DeCanas v. Bica,* 424 U. S. 351, 96 S. Ct. 933, 937 n. 5, 47 L.Ed.2d 43 (1976); *Kewanee Oil Company v. Bicron Corp.*, 416 U. S. 470, 491-492, 94 S. Ct. 1879, 1891, 40 L.Ed.2d 315 (1974); *State v. Texaco, Inc.*, 14 Wis. 2d 625, 111 N.W.2d 918, 923 (1961) (concurring opinion).

As previously indicated, the contention of the oil companies on appeal that Paragraph D is in conflict with the Robinson-Patman Act is premised solely upon the availability of the § 2(b) defense where voluntary allowances are granted. Nevertheless, the trial court in its opinion had

also found that Paragraph D would obstruct the accomplishment and execution of the purposes of the Robinson-Patman Act. Where a state law " 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress,' " it is void under the Supremacy Clause, *Kewanee Oil Company v. Bicron Corp., supra,* 416 U. S. at 479, 94 S. Ct. at 1885, quoting *Hines v. Davidowitz,* 312 U. S. 52, 61 S. Ct. 399, 85 L. Ed. 581 (1941). However, the objectives of both laws must be examined, *Kewanee Oil Company v. Bicron Corp., supra,* 416 U. S. at 480, 94 S. Ct. at 1885, and, where possible, the operation of both should be reconciled so as to avoid preemption, *Merrill Lynch, Pierce, Fenner & Smith v. Ware,* 414 U. S. 117, 127, 94 S. Ct. 383, 389-390, 38 L.Ed.2d 348 (1973). But it is not necessary to attempt to reconcile Paragraph D and the Robinson-Patman Act as the purpose and objectives of both are the same. The purpose of the Robinson-Patman Act was " 'the preservation of equality of opportunity' " by assuring "that businessmen at the same functional level would start on equal competitive footing so far as price is concerned." *Federal Trade Comm'n v. Sun Oil Co., supra,* 371 U. S. at 520, 83 S. Ct. at 367. This is precisely the purpose of Paragraph D: to insure that all retail service station dealers are afforded equal treatment and to prevent discrimination among dealers of the same supplier. Therefore, Paragraph D is not an obstacle to the accomplishment of the same objective.

Consequently, we hold that Paragraph D of the Maryland Act is not invalid under the Supremacy Clause of the United States Constitution.

### (8) *Void for Vagueness*

The oil companies contend that several terms in the Act, which imposes criminal sanctions for violations, are so vague as to constitute a denial of due process of law in violation of Art. 23 of the Maryland Declaration of Rights and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The terms which are allegedly vague are: "producer or refiner"; "voluntary

allowances" and "uniformly" as used in Paragraph D; "equipment rentals" and "uniformly" as used in Paragraph E; and "periods of shortage" and "uniformly ... on an equitable basis" as used in Paragraph F.

The standard for determining whether a criminal statute is void for vagueness was set forth in *United States v. Harriss*, 347 U. S. 612, 617, 74 S. Ct. 808, 812, 98 L. Ed. 989 (1954):

> "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."

*Connally v. General Const. Co.*, 269 U. S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322 (1926); *Bowie Inn v. City of Bowie, supra,* 274 Md. at 239-240; *Giant of Md. v. State's Attorney,* 267 Md. 501, 514-515, 298 A. 2d 427, *appeal dismissed,* 412 U. S. 915, 93 S. Ct. 2733, 37 L.Ed.2d 141 (1973). Where a statute regulates commercial activity, the standard of ordinary intelligence is one of "ordinary commercial knowledge." In other words, the statute must be sufficiently definite so as to inform one possessing "ordinary commercial knowledge" of what conduct is prohibited. *McGowan v. State of Maryland, supra,* 366 U. S. at 428, 81 S. Ct. at 1106 (holding that an exception to the Maryland Sunday closing laws permitting the retail sale of " 'merchandise essential to, or customarily sold at, or incidental to, the operation of' bathing beaches, amusement parks et cetera" was not unconstitutionally vague); *Potomac Sand & Gravel v. Governor, supra,* 266 Md. at 379 (holding that a statute prohibiting the dredging of sand or gravel in "marshlands" was not unconstitutionally vague). Where necessary, the constitutional requirement of definiteness may be satisfied by a reasonable construction of the statute by the courts. *United States v. Harriss, supra,* 347 U. S. at 618, 74 S. Ct. at

812; *Potomac Sand & Gravel v. Governor, supra*, 266 Md. at 379.

Most of the allegedly vague provisions of the Act, such as "voluntary allowances uniformly," as used in Paragraph D, and "periods of shortage," "uniformly" and "on an equitable basis" as used in Paragraph F, have already been discussed. These provisions are, in our view, sufficiently definite so as not to constitute a denial of due process of law. Likewise, we find, as did the trial court, that the term "producer or refiner" is not unconstitutionally vague. A producer, as used in the Act, is a person, firm or corporation engaged in the production of crude oil, *i.e.*, extracting crude oil from the earth. A refiner is one engaged in refining crude oil.

Nor do we find that Paragraph E, which requires that all equipment rentals be applied uniformly to all retail service station dealers supplied, is unconstitutionally vague. Affidavits filed by the oil companies indicated that certain equipment supplied to retail service station dealers is customarily included in the lease of the station. However, certain other items such as "identification signs and credit card imprinters" are not included in the lease but are rented separately to each dealer. We think that the term "equipment rentals" refers to that equipment which, according to industry practice, is supplied to the dealer separate from the lease of the service station. And consistent with the policy of the Maryland Act that all retail service station dealers be treated equally by their supplier, Paragraph E mandates that all dealers be charged the same rental for like equipment.

### (9) *Severability*

The oil companies' final argument is that the various provisions of Ch. 854 are not severable. Recognizing that their substantive due process, commerce clause, unconstitutional taking and equal protection arguments are directed solely at the Act's divestiture provisions (Paragraphs B and C), whereas Paragraphs D and F are challenged only on Supremacy Clause grounds, the oil companies contend that if any of these challenges is accepted

by this Court, then the entire Act should be held invalid. (Appellees' brief, p. 66.) They maintain that the Legislature intended the Act to be "an integrated whole." (*Ibid.*) With respect to the issue of severability, *see* Maryland Code (1957, 1976 Repl. Vol.), Art. 1, § 23; *Blackwell v. State*, 278 Md. 466, 473-474, 365 A. 2d 545 (1976); *Shell Oil Co. v. Supervisor*, 276 Md. 36, 48-49, 343 A. 2d 521 (1975), and cases therein cited. However, since we have rejected all of the challenges to the Act's provisions made by the oil companies in this Court, the issue of severability is not now presented for decision.

> *Judgment of the Circuit Court for Anne Arundel County reversed, and case remanded to that court for entry of a judgment in accordance with this opinion. Appellees to pay costs.*

## ON MOTIONS FOR RECONSIDERATION AND STAY OF MANDATE

*Eldridge, J.:*

Appellees have all filed motions for reconsideration. In all respects but one, the points raised have been adequately answered by this Court's opinion, and to this extent the motions are denied.

The one matter raised which is not dealt with in the Court's opinion involves a question of statutory interpretation. In their motion for reconsideration Commonwealth Oil Refining Company, Inc., and Petroleum Marketing Corporation (PMC) have requested that the mandate of this Court be modified to allow the court below on remand to consider their argument that the Maryland Act is not applicable to PMC. In its declaration, PMC alleged that the term "retail service station" as used in Paragraphs B and C of the Act refers only to retail service stations offering a "full line of automotive services to the motoring public" and that, therefore, those provisions are not

applicable to PMC which operates "gas only" service stations. The trial court did not rule on this issue, and since this question was not raised on appeal, this Court did not consider it. However, as this contention involves only a legal issue of statutory interpretation, we shall now consider it instead of remanding for further trial court proceedings. *See* Maryland Rule 885.

Definitions applicable to the entire Motor Fuel Inspection Law, Maryland Code (1957, 1972 Repl. Vol., 1976 Cum. Supp.), Art. 56, §§ 157A - 157M, of which the challenged statute is a part, are found in Art. 56, § 157A. Section 157A (6) defines "retail service station dealer" as "any person, firm or corporation maintaining a place of business where motor vehicle fuel is sold and delivered into the tanks of motor vehicles." In view of this definition of *"retail service station* dealer," it is clear that "retail service station" refers to any retail place of business where motor vehicle fuel is sold and delivered into the tanks of motor vehicles. The term is not limited to those places which, in addition to selling motor vehicle fuel, also offer automotive services. Moreover, the purpose of Paragraphs B and C is to preserve competition in the retail gasoline market by eliminating what the Legislature determined to be the destructive competition of service stations operated directly by producers or refiners. To so limit the definition of "retail service station" would defeat the purpose of these provisions by allowing producers or refiners to continue to operate retail service stations so long as those stations did not offer automotive services. Such an interpretation of the statute was clearly not intended by the Legislature. Therefore, we hold that "retail service station" as used in Paragraphs B and C includes stations such as those operated by PMC which sell only motor vehicle fuel.

The appellees have also filed a motion to stay the mandate of this Court. If the mandate were to be issued, the circuit court would be required to dissolve the injunction prohibiting appellants from enforcing the Act. Appellees contend that dissolution of the injunction would require immediate enforcement of the divestiture provisions of the

Act by the State prior to possible review and final disposition of this case by the Supreme Court of the United States and would result in irreparable injury. We do not agree that upon dissolution of the injunction, the State will be either permitted or required to enforce the divestiture provisions immediately.

The Act became effective on July 1, 1974. Under Paragraph B, after that date no producer or refiner was to *open* a retail service station operated by company personnel. However, under Paragraph C, producers or refiners were not prohibited from operating retail service stations with company personnel until after July 1, 1975. Thus, the General Assembly provided a one year period from the effective date of the Act in which producers or refiners could convert company operated stations to dealer operation or otherwise divest themselves of company operated stations. The statutory language reflects a clear legislative intent to delay enforcement of the divestiture provisions for one year after the Act becomes operative. The State, interpreting the statute in a like manner, has stated in its answer to the motion that the one year period will be observed in the enforcement of the Act in accordance with the requirements of the statute. Therefore, the divestiture provisions of Paragraph C cannot be enforced until one year from the dissolution of the injunction in the instant case. Consequently, issuance of our mandate will not result in immediate enforcement of the divestiture provisions of the Act. It should also be noted that under Paragraph H of the Act, the Comptroller may permit reasonable exceptions to the divestiture dates in the event that there is no final resolution of this case prior to the one year divestiture period. Accordingly, we do not find that issuance of the mandate will result in irreparable injury to the parties. The motion for stay of mandate is denied.

*Motions denied.*