*Pizza di Joey, LLC, et al. v. Mayor and City Council of Baltimore*, No. 2411, September Term, 2017. Opinion by Nazarian, J.

**DECLARATORY JUDGMENT ACT – LIBERAL CONSTRUCTION – JUSTICIABILITY**

The Declaratory Judgment Act is to be liberally construed and administered. When the contours of the underlying controversy are clear, a party is not required to wait until a regulation is enforced against them to seek a declaratory judgment that the regulation is invalid.

**CONSTITUTIONAL LAW – RATIONAL BASIS – THE REAL AND SUBSTANTIAL RELATION TEST**

The "real and substantial relation test" was the standard applied to economic regulations in the era of economic substantive due process in Maryland. That test is now defunct, and the surviving uses of the real and substantial language in Maryland case law refer to traditional rational basis review.

**CONSTITUTIONAL LAW – RATIONAL BASIS – ARTICLE 24 RATIONAL BASIS**

Article 24 rational basis scrutiny is slightly different from its federal counterpart. Unlike the federal rational basis test, Article 24 rational basis delves into the nature of the right infringed by the challenged statute, regardless of whether it has been declared fundamental under the U.S. Constitution. So long as the law doesn't impair important private rights, traditional rational basis scrutiny applies. But when important private rights are implicated, courts apply a higher degree of scrutiny than traditional rational basis.

**CONSTITUTIONAL LAW – RATIONAL BASIS – ARTICLE 24 RATIONAL BASIS**

Article 24 rational basis requires a closer fit between the means and the ends of regulations that affect important personal rights, and it does not permit courts to speculate about the legislature's purpose.

**CONSTITUTIONAL LAW – RATIONAL BASIS – ARTICLE 24 RATIONAL BASIS**

Wholly economic regulations that do not implicate important private rights are subject to traditional rational basis review.

**CONSTITUTIONAL LAW – RATIONAL BASIS – ARTICLE 24 RATIONAL BASIS**

The City's 300-foot rule is a wholly economic regulation subject to traditional rational basis review. The City's legitimate interest in protecting brick-and-mortar restaurants from free-riding mobile vendors is rationally furthered by the 300-foot rule.

**CONSTITUTIONAL LAW – VAGUENESS – FACIAL VAGUENESS CHALLENGE**

Facial vagueness challenges under the Maryland Constitution are permitted only when the challenged statute implicates a fundamental constitutional right.

**CONSTITUTIONAL LAW – VAGUENESS – AS-APPLIED VAGUENESS CHALLENGE**

The constitutionality of a statute attacked based on an as-applied vagueness challenge must be determined solely from the statute's application to the facts presented. When a statute has not been enforced against the party seeking to invalidate it, the court may not consider theoretical applications to determine whether it is unconstitutionally vague.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2411

September Term, 2017
_____

PIZZA DI JOEY, LLC, ET AL.

v.

MAYOR AND CITY COUNCIL OF
BALTIMORE
_____

Nazarian,
Friedman,
Battaglia, Lynne A.
   (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Nazarian, J.
_____

Filed:  May 30, 2019

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Baltimore is home to over a thousand brick-and-mortar restaurants and about seventy licensed food trucks, including Pizza di Joey and Madame BBQ (collectively "the Food Trucks"). Baltimore City Code, Article 15, § 17-33, known colloquially as the "300-foot rule," prohibits mobile food vendors from conducting business within 300 feet of brick-and-mortar establishments that sell primarily the same kind of food.

In October 2016, the Food Trucks sued the City in the Circuit Court for Baltimore City. They asked the court to declare that the 300-foot rule functionally prohibited them from operating in Baltimore City and, therefore, violated their rights under Article 24 of the Maryland Declaration of Rights. The City countered that the rule did not prevent food trucks from thriving in Baltimore City and that the rule's location restrictions furthered the City's legitimate interest in supporting local brick-and-mortar businesses that had invested in Baltimore's commercial neighborhoods.

After a trial, the circuit court found (using what it called "heightened rational basis review") that the 300-foot rule did not violate the Food Trucks' rights under Article 24, but that the ambiguities in the statutory language rendered it unconstitutionally vague. We hold that the ordinance should have been measured for rational basis, that it does not violate Article 24, and that it is not unconstitutionally vague. We affirm the circuit court's rulings on Article 24 and reverse the judgment enjoining the City from enforcing the rule.

## I.  BACKGROUND

### A.  The 300-Foot Rule

The Baltimore City Code regulates the places mobile food vendors can operate. One restriction, known as the "300-foot rule," has been around since the 1970s, but in its most

recent form, which took effect on February 28, 2015, prohibits mobile vendors[1] from operating within 300 feet of a business that sells primarily the same food, merchandise, or service:

> A mobile vendor may not park a vendor truck within 300 feet of any retail business establishment that is primarily engaged in selling the same type of food product, other merchandise, or service as that offered by the mobile vendor.

Baltimore City Code, Art. 15, § 17-33.[2]

A food truck that violates the 300-foot rule commits a misdemeanor. Baltimore City Code, Article 15, § 17-42. Violators must pay a fine of $500, *id.*, and may also have their mobile vending licenses suspended or revoked. Baltimore City Code, Art. 15 § 17-44(a). If a licensee commits three violations within a one-year period, revocation is mandatory. Baltimore City Code Art. 15 § 17-44(b). And once a mobile vendor's license has been revoked, "the former licensee may not apply for a new license until at least 1 year from the date of revocation." Baltimore City Code, Art. 15, § 17-44(c).

A number of City agencies, including the Department of Transportation, the

---

[1] A mobile vendor is defined as "any person that sells, distributes, or offers to sell or distribute food products, other merchandise of any kind, or services from a motor vehicle on City streets or private property within the City of Baltimore." Baltimore City Code, Art. 15, § 17-1(e).

[2] The Code contains six proximity regulations. *See* Baltimore City Code, Art. 15, §§ 17-32 (mobile vendors may not operate within two blocks of a designated mobile vending zone); 17-35 (mobile vendors may not operate in residential neighborhoods); 17-37 (mobile vendors may not operate within two blocks of a City Market); 17-38 (mobile vendors may not operate within two blocks of any public or private school or public transit stop serving a public or private school); 17-39 (mobile vendors may not operate within two blocks of a farmers' market while the market is open without the express permission of the market organizer). Section 17-33 is the only one at issue here.

2

Department of General Services, the Baltimore City Police Department, and the University of Maryland Police, enforce the 300-foot rule.[3] Aside from the text of the rule itself, no guidelines elaborate on how the rule should be enforced or define the phrases "primarily engaged in" or "same type of food product" with any further precision.

Although these penalties have been on the books since 2015, no vendor has received a citation or had a license suspended for violating the 300-foot rule. Instead, when mobile vendors violate the rule, the City's enforcement authorities ask them to relocate or to alter their menus according to what brick-and-mortar establishments are nearby. Enforcement authorities initiate these measures only in response to a complaint that a food truck is parked too close to a brick-and-mortar business.

## B. The Food Trucks

Pizza di Joey is a Maryland-based limited liability company and a mobile vendor licensed in Baltimore City. *See* Baltimore City Code, Art. 15, § 17-1. Pizza di Joey is an Italian kitchen on wheels, complete with 4000-pound brick pizza oven, and has sold "authentic New York style brick oven pizza, as well as some Italian pastas and salad" since 2014. The "Joey" of Pizza di Joey is its owner and founder, Joseph Salek-Nejad, known professionally as Joey Vanoni.[4] Pizza di Joey is open for business several afternoons per week. Although Mr. Vanoni had intended his "center for business operation" to be Baltimore City, he now operates in Anne Arundel County the vast majority of the time,

---

[3] The University of Maryland Police have concurrent jurisdiction with the Baltimore City Police Department in certain areas on and around the University campus.

[4] Vanoni is Mr. Salek-Nejad's mother's maiden name.

purportedly as a result of the prohibitive nature of the 300-foot rule.

Pizza di Joey has never been cited for violating the 300-foot rule, but was approached once by law enforcement in 2015 in response to a brick-and-mortar restaurant's complaint. Pizza di Joey was setting up for lunch service on the 800 block of West Baltimore Street when a University of Maryland Police officer approached and told Mr. Vanoni that a nearby deli had complained that he was parked too close. Mr. Vanoni explained to the officer that because the deli did not serve pizza, he understood that he was permitted to park his truck nearby without violating the 300-foot rule. The officer was not familiar with the particulars of the rule, so Mr. Vanoni pulled up the text of § 17-33 on his laptop and showed it to him. The officer agreed after reviewing the rule that there was no violation and went on his way. Beyond selling the same officer a slice of pizza later that day, that one encounter represented all of Pizza di Joey's interactions with enforcement authorities relating to the 300-foot rule.

Madame BBQ is a Maryland-based limited liability company founded in the summer of 2014. In 2016, Madame BBQ rebranded its food truck as MindGrub Café and shifted from selling barbeque to more health-conscious cuisine, self-described as "brain food for knowledge workers." Madame BBQ is owned by Nicole McGowan, who has worked in the food service industry since she was fifteen. When Ms. McGowan began operating Madame BBQ in 2014, she conducted most of her business in Howard County. At that time, she was not a licensed mobile vendor in Baltimore City and only took her truck there occasionally through one-day permits for block parties and special events. At the time of trial, Ms. McGowan was in the process of relocating "the focus of [her]

4

operations" to Baltimore City, where she would ideally like to sell lunch from her truck on weekday afternoons. She is now licensed in Baltimore City.

Madame BBQ has never been cited for violating the 300-foot rule and has never had any encounter with enforcement agencies. But the rule is so prohibitive, Ms. McGowan claims, that she does not take her truck out in Baltimore City because there is nowhere she feels she can serve lunch that doesn't "make [her] afraid to get a citation or lose [her] license."

### C. The Lawsuit

Pizza di Joey and Madame BBQ filed this action in the Circuit Court for Baltimore City on May 11, 2016. They alleged that the 300-foot rule violated their rights to equal protection and due process under Article 24 of the Maryland Declaration of Rights, both on its face and as applied. The Food Trucks sought a declaratory judgment stating the 300-foot rule was unconstitutional and a permanent injunction against its enforcement. The City filed a Motion to Dismiss the complaint, which was denied. The parties' cross-motions for summary judgment were also denied and the case was set for trial.

The trial lasted two days and included testimony from Mr. Vanoni, Ms. McGowan, and Anirban Basu, an expert witness offered by the City who testified about the impact of food trucks on brick-and-mortar businesses and the economic viability of commercial neighborhoods. The Food Trucks' owners' depositions also were admitted into evidence, along with the depositions of two City employees deposed as its representatives—Gia Montgomery of the Department of Transportation, who testified that she was the person most qualified to speak authoritatively on mobile vending licensure and regulation

5

enforcement, and Babila Lima of the Department of General Services ("DGS"), who drafted both the 300-foot rule and the materials posted to the DGS website offering guidance on the mechanics of mobile vending regulations.

Mr. Vanoni testified that the 300-foot rule has essentially driven him out of Baltimore City, contrary to his original intention to make Baltimore the center of his business. He explained that the rule is "extremely limiting on my business' ability to successfully operate. . . . I've been compelled to operate outside the City which is not what I intended. I'd like to operate [in Baltimore]." He claimed that the 300-foot rule prohibited him from operating in the Baltimore neighborhoods where his business was most likely to succeed, such as Hampden:

> MR. VANONI: It's a great area. It's [an] up and coming neighborhood here in Baltimore. I've got some friends that live up there. They bought some homes there and it's kind of like a culinary incubator. . . . It's upbeat. It's fun. And it's a cool place to hang out.
>
> PIZZA DI JOEY'S COUNSEL: What steps did you take to analyze the effect of the 300-foot rule and your ability to operate in the Hampden area?
>
> MR. VANONI: I got a list of all the restaurants in the area and I took evaluation of their menus and compared their menus trying to look for any conflicts with regards to this 300-foot rule. Then I shortened my list, went to Hampden and walked the streets verifying their locations with a map I had and the list I created.
>
> PIZZA DI JOEY'S COUNSEL: And about how many restaurants did you identify that concerned you?
>
> MR. VANONI: Hampden, it was 12.
>
> PIZZA DI JOEY'S COUNSEL: And in identifying those 12 what conclusions did you draw about your ability to operate in Hampden?

6

MR. VANONI: I couldn't operate there successfully.

In addition to Hampden, Mr. Vanoni expressed concern about taking his truck to Federal Hill, Harbor East, Canton, and Fells Point.

Mr. Vanoni also testified about his encounter with the University of Maryland Police, and explained that it caused him to reevaluate and ultimately change his business plan:

> PIZZA DI JOEY'S COUNSEL: What were the lessons you drew from your experience with the University of Maryland police officer?
>
> MR. VANONI: That this law's enforced, that on any given day I could be approached and, you know, I don't want to sound like I'm so important, but I operate my business and I'm on the truck. So when somebody's occupying my time I can't prep. It gave me great pause and concern for operating because I can go here and, you know, even though I could be completely in the right I have to sit here and argue my case every day with an enforcement officer whatever uniform they're wearing or out of uniform and that takes up time from operating. I start off the day normally by myself until my staff arrives, so it's kind of precious time.
>
> ***
>
> PIZZA DI JOEY'S COUNSEL: Were you more concerned about the 300-foot rule after this incident?
>
> MR. VANONI: Absolutely. I realized it wasn't[,] not that I took it lightly[,] but it definitely wasn't a law to take lightly or an order to take lightly not that I really do take laws lightly, but I realize that it was enforced and kind of like, you know, just kind of reiterating what I said before on any given day I could go out there and try to operate and potentially be approached by somebody who is trying to just call on a complaint. They're doing their job. I get that. I'm not in the habit of, you know, getting into argument with law enforcement officers. So yeah, it definitely raised my level of concern.

Ms. McGowan expressed similar concerns in her testimony. She said that the 300-

7

foot rule placed entire neighborhoods off limits to MindGrub Cafe, particularly Federal Hill, Hampden, Harbor East, Downtown, Locust Point, and Woodberry. She also shared Mr. Vanoni's concerns about profits she lost as result of time spent justifying her truck's presence to law enforcement:

> MADAME BBQ'S COUNSEL: [D]oes your concern about the 300 foot rule influence where you decide to set up?
>
> MS. MCGOWAN: Yes, it does.
>
> MADAME BBQ'S COUNSEL: How so?
>
> MS. MCGOWAN: I definitely don't take my truck out very often, because I'm fearful of where I can park. I haven't found any places that are not--that don't make me afraid to get a citation or lose my license.
>
> ***
>
> [A]s we heard from Joey, you know, all of this takes time. And to try to have to, you know, prove your case, you know, whenever you go out, and the fear of having to prove your case – you know, if someone comes up and says, "[y]ou need to prove you are not in violation." That all takes time. I mean, lunch service is not very long.

The City's expert, Anirban Basu, testified at length about the problems food trucks present to brick-and-mortar eateries and how the 300-foot rule might address those concerns. Mr. Basu is CEO of an economic and policy consultancy that has represented many Baltimore businesses, developers, and agencies. He co-authored an economic development strategy for Baltimore City, and was consultant for the developers of Harbor East, Harbor Point, and Port Covington. Mr. Basu testified that vacancies in commercial neighborhoods affect both public safety and the commercial viability of Baltimore neighborhoods:

> MR. BASU: I really believe that commercial vacancies are

8

very injurious in terms of creating an environment not conducive to public safety. . . . If [people] see a lot of vacant space they see a lot of hopelessness. Often vacant space associated with deteriorating physical conditions of buildings. That also sends out signals to people. And people often respond with their behaviors to those signals. So what you want is very vibrant commercial districts . . . low vacancy rate. . . .

CITY'S COUNSEL: And based on your economic knowledge . . . do vacancies make it more difficult to attract new businesses to those areas?

MR. BASU: Oh yes, they do. And [] that's because again it sends a signal to potential tenants that this may not be the place for them. . . . [O]ne of the things you tend to see in commercial real estate is that an area that has suffered high vacancy often continues to suffer high vacancy. . . . So vacancy breeds vacancy. And it's very difficult once a commercial area stops being vibrant to bring that vibrancy back. And we see that throughout Baltimore.

Mr. Basu described the different contributions that brick-and-mortar restaurants and food trucks make to the City:

CITY'S COUNSEL: How are [food trucks'] contributions to a commercial district different from the contributions that you testified that restaurants contribute to a commercial district?

MR. BASU: Restaurants are semi-permanent members of their community. . . . Food trucks by definition are mobile. They're not affixed to a particular community. They're not necessarily pillars of their community. And of course they're not in brick and mortar context. And so they're not generating property taxes, directly or indirectly, the way that a restaurant would.

He also addressed the disparity in financial investment, and the corresponding disparity in risk, between brick-and-mortar restaurants and food trucks:

MR. BASU: . . . based on the parameters I found from various industry publications, [] it's reasonable to conclude that a typical restaurant entrepreneur is investing and, therefore, risking about four times as much money as is a food truck entrepreneur. Both are taking risks. Both are to be respected

9

for taking those risks. It's wonderful. But the restaurateur on average is making a much larger gamble financially than is a typical food truck entrepreneur.

He explained that in addition to the greater financial investment and corresponding impact on the local economy, brick-and-mortar entrepreneurs make a long-term commitment to the communities in which they operate. They provide tenancy, which increases property values, enter long-term leases, provide employment in greater numbers, and, most importantly, cannot pack up and leave easily. Food trucks, conversely, are able to "cherry pick" hours and locations to optimize profits without committing to any particular neighborhood. If a neighborhood they frequent experiences crime or heavy construction, or anything else that might deter customers from returning, food trucks can drive their business to a more desirable location. And by setting up directly beside a brick-and-mortar competitor, food trucks take advantage of the environment created by the restauranteurs' investments while siphoning off a portion of the business that their competitors have worked to generate. Mr. Basu testified that these dynamics did not "strike [him] as fair competition and it very much [struck him] as a free rider problem." Mr. Basu opined that the 300-foot rule addressed the problem of unfair competition between the two business types "very strongly":

> My conclusion is very firmly that [the 300-foot] rule enures to the benefit of the people of Baltimore and to the benefit of the level of commercial transactions that will take place in this city over the long term that it supports entrepreneurship and that it supports street-level vitality.

After the trial concluded, the court took the case under advisement, then issued a written Memorandum and Order on December 20, 2017. After finding that the 300-foot

10

rule was not unconstitutional *per se*, the court considered the appropriate standard for measuring the Food Trucks' Article 24 claims. The court applied "heightened rational basis" scrutiny and found that the rule was not unconstitutional under that standard:

> Applying the heightened rational standard of review to the 300 foot rule this Court concludes that this provision is not unconstitutional because it (1) protects the contributions brick-and-mortar retail establishments make to the City's commercial districts; (2) promotes entrepreneurial investments and opportunity by eliminating the potential risks of food trucks; and (3) diversifies the marketplace to maximize positive economic effect by creating meaningful choices for the consumer. The 300-foot rule promotes brick-and-mortar establishments throughout the City by eliminating the threat of mobile vendors, and ensuring brick-and-mortar establishments become a permanent fixture in the City. Promoting brick-and-mortar restaurants provides jobs, property tax revenues, and prevents a growing number of vacant properties. The commercial district of this City is dependent on these brick-and-mortar establishments' long-term real estate investments. The City's economic vitality is dependent upon the flourishment of its commercial district.
>
> As stated in [*Attorney General v.*] *Waldron*, [289 Md. 683 (1981)], a State may enact regulations that may be burdensome on an individual's right to engage in their choice of occupation, as long as that regulation is required for the protection of the public health, safety, and morals. This Court agrees that the vitality of commercial districts is dependent upon the success of brick-and-mortar establishments, which promotes a successful economy. The 300-foot rule serves the legitimate purpose of promoting the City's general welfare by establishing a 300-foot distance between brick-and-mortar establishments and mobile vendors. The City is entitled to protect the general welfare by ensuring the vibrancy of commercial districts.
>
> Thus, this Court declares that Baltimore City Code, Article 15, Section 17, *et seq.*, is constitutional and does not infringe on the [Food Trucks'] Due Process and Equal Protection rights.

Although there was some uncertainty about whether the Food Trucks had

challenged the rule on vagueness grounds—as we detail later, their complaint didn't include a vagueness claim, and they alternately disclaimed and embraced the theory at different times during the trial and closing arguments—the court determined that they had raised both a facial and as-applied vagueness challenge and concluded that the 300-foot rule was unconstitutionally vague in two ways. *First*, the court found that the phrases "primarily engaged in" and "same type of food product" left the parties without fair notice of the rule's scope and how the City would enforce it. *Second*, the court found that "the entities enforcing this ordinance do not have guidance as to how to measure the 300-foot distance between bricks-and-mortar establishments and food trucks." As a result, the court granted the Food Trucks' request for injunctive relief and enjoined the City from enforcing the 300-foot rule. The order stayed the injunction for sixty days, but the stay expired on February 19, 2018, and the injunction went into effect.

The circuit court denied motions to reconsider and to stay, and this Court denied a motion to stay the injunction as well. The Food Trucks, notwithstanding their victory, appealed the circuit court's decision finding no violation of their due process or equal protection rights, and the City cross-appealed.

## II. DISCUSSION

At the threshold, we consider, and reject, the City's contention that the Food Trucks have not presented a justiciable controversy under the Declaratory Judgment Act. From there, we move to the merits: we hold that rational basis is the appropriate level of constitutional scrutiny to apply in reviewing the 300-foot rule, we find that standard met, and we hold that the circuit court erred in finding the rule void for vagueness.

12

**A. The Food Trucks Presented A Justiciable Controversy Under The Declaratory Judgment Act.**

The Mayor and City Council argue that the Food Trucks "failed to present an action that was ripe under the meaning of the declaratory judgments act." Because neither of the Food Trucks has been cited for violating the 300-foot rule, and because there is no guarantee that they ever will be, the City reasons that the Food Trucks "have merely presented an issue that exists in the abstract," and the circuit court should have dismissed the case. We disagree and find that the Food Trucks have alleged a justiciable controversy under the declaratory judgment act.[5]

The declaratory judgment act provides that "a court may grant a declaratory judgment or decree in a civil case, if it will serve to terminate the uncertainty or controversy giving rise to the proceedings, and if an actual controversy exists between contending parties." Md. Code (1974, 2013 Repl. Vol.) § 3-409(a)(1) of the Courts and Judicial Proceedings Article ("CJ").[6] But a court cannot consider a declaratory judgment action unless the underlying controversy is justiciable. *State Center, LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 591 (2014); *Hatt v. Anderson*, 297 Md. 42, 45 (1983) ("the existence of a justiciable controversy is an absolute prerequisite to the maintenance of a declaratory judgment action").

Among the "numerous hurdles" to justiciability is ripeness. *State Center*, 438 Md.

---

[5] There are additional justiciability concerns related to the circuit court's vagueness findings. We address those in Section C, below.

[6] CJ § 3-409 provides an exception not applicable in this case for divorce and annulment of marriage.

at 591 (*quoting Boyds Civic Ass'n v. Montgomery Cty. Council*, 309 Md. 683, 690 (1987)). "Under the ripeness doctrine as applied to actions for declaratory relief, a case ordinarily is not ripe if it involves a request that the court declare the rights of parties upon a state of facts which has not yet arisen or upon a matter which is future contingent and uncertain." *Stevenson v. Lanham*, 127 Md. App. 597, 612 (1999) (cleaned up). But because one of the primary purposes of the declaratory judgment act is to "relieve litigants of the rule of the common law that no declaration of rights may be judicially adjudged unless a right has been violated," ripeness in this context "can become an elusive concept." *Boyds Civic Ass'n*, 309 Md. at 691 (*quoting Davis v. State*, 183 Md. 385, 388 (1944).

The City argues that the Food Trucks had not "allege[d] and prove[n] that they have been prosecuted . . . or that there is a credible threat of prosecution under [the] contested statute." *State v. G. & C Gulf, Inc.*, 442 Md. 716, 732 (2015). And a credible threat of prosecution is ordinarily a prerequisite to a declaratory judgment action challenging a penal statute. The mere existence of a criminal statute does not generally create "such a threat as to present a justiciable controversy." *Id.* at 731. And it's true that neither Pizza di Joey nor Madame BBQ faced imminent prosecution when they brought this case before the circuit court. But if the Food Trucks' only opportunity to challenge the 300-foot rule's constitutionality arises when they are issued a citation, that opportunity is unlikely ever to arise because the City and its enforcement agencies do not enforce the 300-foot rule by pursuing any of the penal consequences authorized by the Baltimore City Code. Violations of the 300-foot rule are misdemeanors, but the rule doesn't operate like a typical penal statute.

When considering a statute's constitutionality, we are more concerned with its substance than its label, and so too when we assess the ripeness of the Food Trucks' challenge here. Although designated a misdemeanor, the 300-foot rule is, in substance and application, a local economic regulation. The primary injury the Food Trucks allege is not the possibility of prosecution, which the Court of Appeals has rejected as non-justiciable, *see, e.g.*, *G. & C Gulf, Inc.*, 442 Md. at 732, but the loss of their right to pursue a business opportunity in their chosen profession, an interest that qualifies readily as a basis for a declaratory judgment. *See, e.g.*, *Bruce v. Dir., Dep't. of Chesapeake Bay Affairs*, 261 Md. 585, 595 (1971) (*quoting Davis*, 183 Md. at 389) ("[I]n this case complainant is affected by the [statute] and he is entitled to apply for declaratory judgment under the uniform act, rather than run the risk of being subjected to criminal prosecution."); *Oyarzo v. Md. Dep't of Health and Mental Hygiene*, 187 Md. App. 264, 275 (2009) ("[T]he right [the challenger] seeks to protect is the right to pursue a business opportunity. . . . There is no need for [him] to violate the challenged regulation in order for us to consider whether it was within the scope of the Department's authority to adopt [the regulation at issue].").

As licensed mobile vendors in Baltimore City, Pizza di Joey and Madame BBQ are indisputably limited in their business if the 300-foot rule survives. The rule restricts where they can sell and affects their potential profitability. Although the City characterizes this controversy as purely abstract and theoretical, its contours are visible: the 300-foot rule requires mobile vendors to keep their distance from direct brick-and-mortar competitors, in ways we can measure and draw on maps (as the parties have). The Food Trucks abided by the restrictions while they were in effect, but they contend that the rule violates their

15

rights under Article 24 of the Maryland Declaration of Rights and injures their business interests. Given the remedial nature of the declaratory judgment act and the general principle that it is to be "liberally construed and administered," *Boyds Civic Ass'n,* 309 Md. at 688, we find the Food Trucks' claims sufficiently "concrete and specific" to generate a controversy that is ripe for review. *Hatt*, 297 Md. at 46.

## B. The 300-Foot Rule Is A Constitutional Exercise Of The City's Police Power.

The Food Trucks argue that the 300-foot rule "violated their rights to equal protection and substantive due process both on its face and as applied" under Article 24 of the Maryland Declaration of Rights.[7] Article 24 of the Maryland Declaration of Rights encompasses both of these protections:

> That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Although Article 24 does not contain an express equal protection clause, our courts long have recognized that "the concept of equal protection nevertheless is embodied in the Article." *Renko v. McLean*, 346 Md. 464, 482 (1997); *see also Tyler v. City of Coll. Park*, 415 Md. 475, 499 (2010). Article 24 equal protection doctrine and federal equal protection

---

[7] The Food Trucks identified the following Questions Presented in their brief:

1. Does using the police power for the express purpose of stifling one class of businesses so as to financially enrich another class constitute a valid government interest under the Maryland Constitution?

2. Does Article 15, Section 17-33 of the Baltimore City Code, as interpreted and enforced, fail Maryland's real-and-substantial test?

doctrine are "complementary but independent." *Verzi v. Balt. Cty.*, 333 Md. 411, 417 (1994). We consider U.S. Supreme Court decisions interpreting the federal equal protection clause persuasive but not controlling, and we may find a discriminatory classification unconstitutional for failing to provide equal protection under Article 24 alone. *Attorney Gen. of Md. v. Waldron*, 289 Md. 683, 715 (1981).

The Food Trucks characterize the 300-foot rule as a baseless and discriminatory restriction on mobile vendors in Baltimore City, one that functionally prohibits them from operating their businesses in some of Baltimore's most commercially desirable neighborhoods. As they seek to frame it, the rule infringes on their important personal right to practice their chosen trade, and they urge us to find that the 300-foot rule is invalid on its face and in its application to mobile vendors in Baltimore City.

In reality, the 300-foot rule is classic economic regulation, one with a fairly narrow scope grounded in an entirely rational basis. The rule doesn't prohibit mobile vendors from operating in any particular area of Baltimore City. It simply requires each vendor to maintain a distance of 300 feet (roughly one Baltimore block) from its direct brick-and-mortar competitors. The rule is designed, according to the City and its trial witnesses, to address the "free-rider"[8] problem that arises when mobile vendors set up shop near brick-

---

[8] The city defines "free-riders" as follows:

> [A] food truck that is primarily engaged in selling the same type of food as a restaurant can benefit from the latter's greater investment in creating a market at a particular location by siphoning away customers, which carries the possibility of threatening the vitality of the restaurant.

and-mortar restaurants that have made a comparatively greater economic investment, and attract the customer base that mobile vendors then solicit (and, ideally, convert).

With these dual framings in mind, we assess the Food Trucks' arguments, apply rational basis review, and hold that the 300-foot rule passes constitutional muster under Article 24.

### 1. The 300-Foot Rule is not *per se* unconstitutional.

A facial constitutional challenge attacks the legislation in question as unconstitutional *per se.* To prevail on a facial challenge, the "party challenging the facial validity of a statute 'must establish that no set of circumstances exist under which the Act would be valid.'" *Koshko v. Haining*, 398 Md. 404, 426 (2007) (*quoting U.S. v. Salerno*, 481 U.S. 739 (1987)). An as-applied challenge, conversely, "claim[s] that a statute is unconstitutional on the facts of a particular case or in its application to a particular party." *Motor Vehicle Admin. v. Seenath*, 448 Md. 145, 181 (2016) (*citing As-Applied Challenge*, BLACK'S LAW DICTIONARY (10th ed. 2014)). Facial constitutional challenges are generally disfavored because they carry the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri*, 541 U.S. at 609 (cleaned up).

The Food Trucks argue that the 300-foot rule is unconstitutional on its face because the rule's "anti-competitive ends and [] economic favoritism" misuse the City's police power. They claim that "[f]or almost a century, the Court of Appeals has invalidated discriminatory laws that use public power to generate private gain" and has "repeatedly held that the police power should not be used for such anti-competitive ends, and that economic favoritism is wholly illegitimate." But they cite no cases, and we have not found

18

any, in which this Court or the Court of Appeals struck down an economic regulation based on a facial challenge. The cases on which they rely for these propositions were all decided on a review of the challenged statutes as applied to the plaintiffs in each case. *See Verzi*, 333 Md. at 411; *Bruce*, 261 Md. at 585 (1971); *Md. State Bd. of Barber Exam'rs v. Kuhn*, 270 Md. 496 (1973). Moreover, there *is* support in Maryland case law for constitutionally valid economic regulations targeted at curbing unfair competition. *See, e.g.*, *Salisbury Beauty Schools v. State Bd. of Cosmetologists*, 268 Md. 32, 56 (1973). We agree with the circuit court that the 300-foot rule is not unconstitutional *per se*.

## 2. The 300-foot rule is subject to Article 24 rational basis review.

"[W]hen a statute creates a distinction based upon clearly 'suspect' criteria, or when [it] infringes upon personal rights or interests deemed to be 'fundamental,'" that statute is subject to strict scrutiny. *Waldron*, 289 Md. at 705. A statute that triggers strict scrutiny is presumptively unconstitutional and survives only if the government can demonstrate that the challenged statute is "necessary to promote a compelling government interest." *Waldron*, 289 Md. at 705–06 (*quoting Dunn v. Blumstein*, 405 U.S. 330, 342 (1972) (*quoting Shapiro v. Thompson*, 394 U.S. 618, 634 (1969))); *Koshko*, 398 Md. at 438. But where, as here, the statute doesn't discriminate based on a suspect classification, *i.e.*, when the statute does not differentiate based on race, religion, alienage, or national origin, and when no fundamental, enumerated constitutional right is implicated, it is subject to highly deferential, rational basis review.[9] *Frey v. Comptroller of Treasury*, 422 Md. 111, 163

---

[9] That said, rational basis review is not purely perfunctory or "toothless." The Court of Appeals "has not hesitated to strike down discriminatory economic regulation that lacked

19

(2011).

Both sides seem to agree that we should apply rational basis review to the 300-foot rule—and so do we—but they articulate significantly different visions of what that scrutiny entails. The City advocates for "deferential rational basis review" that recognizes the City's "wide discretion in determining what the public welfare requires and is free to adopt economic regulations so long as it has a ***rational basis to believe*** those regulations are appropriate to protect and promote that welfare." The City recognizes correctly (as we explain below) that under certain circumstances, a more searching inquiry is required, but argues that the 300-foot rule does not call for anything more than the most deferential standard.

The Food Trucks advocate for a version of rational basis that they call "the real-and-substantial test," a test that is "far more probing than the cursory examination called for by the City." But the Food Trucks don't provide a clean definition or a single origin for their proposed standard, and after a thorough review of our case law, we can understand why—over many years of Maryland Constitutional jurisprudence, the standards of scrutiny and the language used to describe those standards have become muddled. The lack of clarity is a natural side effect of doctrinal evolution. As courts apply constitutional standards to novel situations in changing times and incorporate, to varying degrees, federal constitutional

---

any reasonable justification." *See, e.g.*, *Frankel v. Board of Regents of the Univ. of Md. Sys.*, 361 Md. 298, 315 (2000) (*quoting Maryland Aggregates v. State*, 337 Md. 658, 673 (1995)) (striking down a university policy that precluded students with out of state financial support from seeking in-state tuition as arbitrary and irrational).

principles into our State law, language that once seemed clear can become a source of confusion and disagreement. It has in this case.

Our review of the law on which the Food Trucks rely reveals that their proposed "real-and-substantial test" derives from two theories of enhanced Article 24 scrutiny. The Food Trucks rely *first* on a standard derived from a now-defunct theory of economic substantive due process,[10] and *second* from the still-valid-but-not-applicable-here Article 24 standard that applies to statutes that implicate important but non-fundamental constitutional rights.

### a. Substantive due process and the "real and substantial relation test"

"Substantive due process involves judicial scrutiny of legislative ends rather than the means used to reach those ends." Michael Carlton Tolley, *State Constitutionalism in Maryland* 113 (1992). In the *Lochner* era, roughly from 1905–1937, the Supreme Court invalidated a series of federal and state economic regulations on the theory that they interfered with private economic liberty and contract rights. *See, e.g.*, *Lochner v. N.Y.*, 198 U.S. 45 (1905) (statute limiting the number of hours bakery employees were permitted to work violated the due process clause); *Adkins v. Children's Hosp.*, 261 U.S. 525 (1923) (statute fixing a minimum wage for women unconstitutional for violating women's liberty of contract) (*overruled by West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937)). The

---

[10] For a more thorough history of the doctrine and its application in Maryland, *see* Michael Carlton Tolley, *State Constitutionalism in Maryland* 111–23 (1992) and Dan Friedman, *The Maryland State Constitution* 58–59 (2011).

Court of Appeals adopted a similar standard back then, and articulated it in the way the

Food Trucks articulate it now:

> At common law the right of the individual to dispose of his property or his services at such price as he and the purchaser may agree upon is firmly established, and inasmuch as the [challenged statute] is in derogation of that common right, it must be strictly construed. In other words, we are not to infer that the Legislature intended to change common law principles beyond what is clearly expressed by the statute. . . . Freedom of contract is not absolute. It is subject to reasonable legislative regulation in the interest of public health, safety, and moral . . . . But restraints upon such freedom must not be arbitrary or unreasonable. **Freedom is the general rule and restraint the exception. The legislative authority to abridge can be justified only by exceptional circumstances. The guaranty of due process simply demands that the law shall not be unreasonable, arbitrary, or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained.**

*Daniel Loughran Co. v. Lord Baltimore Candy & Tobacco Co.*, 178 Md. 38, 44 (1940)

(emphasis added) (internal quotation omitted) (*citing Nebbia v. N.Y.*, 291 U.S. 502 (1934)).

The Supreme Court "repudiated substantive due process theory at least as it applies

to economic rights" long ago. Dan Friedman, *The Maryland State Constitution* 58 (2011);

*see West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937). But for some time, our Court of

Appeals explicitly declined to follow suit:

> [I]t is readily apparent that whatever may be the current direction taken by the Supreme Court in the area of economic regulation . . . Maryland . . . adhere[s] to the more traditional test formulated by the Supreme Court [in the *Lochner* era].

*Md. Bd. of Pharmacy v. Sav-A-Lot, Inc.*, 270 Md. 103, 120 (1973). Maryland constitutional

scholars refer to this standard for economic regulations, held over in our State law long

after the *Lochner* era had ended, as the "real and substantial relation test."[11] It is from that bygone era that the Food Trucks pulled many of the decisions that, they say, render the 300-foot rule unconstitutional under Article 24. *See, e.g.*, *Kuhn*, 270 Md. at 496; *Bruce*, 261 Md. at 585.

In 1977, though, the Court of Appeals abandoned the "real and substantial relation test" and brought Article 24's notion of substantive due process (back) in line with the United States Constitution's:

> Judicial deference to legislative judgment is appropriate when reviewing legislation dealing with economic problems. . . . **We have returned to the original constitutional proposition that courts do not substitute their social and economic beliefs for the judgment of legislative bodies**, who are elected to pass laws. . . . We are not concerned [] with the wisdom, need, or appropriateness of the legislation. **Legislative bodies have broad scope to experiment with economic problems** . . . . We refuse to sit as a superlegislature to weigh the wisdom of legislation . . . . **[T]he wisdom of [the challenged statute] is not for us to judge as it is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it.**

*Governor of Md. v. Exxon*, 279 Md. 410, 424–26 (1977) (emphasis added) (internal quotation and citation omitted). Even so, the "real and substantial" language appears occasionally in our case law. But this vestige of the *Lochner*-like substantive due process standard does not carry any of its old meaning. Where it survives, the phrase "real and

---

[11] *See* Friedman, *supra*, at 58–59; Charles A. Rees, *State Constitutional Law for Maryland Lawyers: Individual Civil Rights*, 7 U. BALT. L. REV. 299, 313 (1978). One scholar goes so far as to characterize the standard as "intermediate scrutiny." Michael Carlton Tolley, *State Constitutionalism in Maryland* 111 (1992).

substantial" has meant, and has been applied the same way as, traditional rational basis scrutiny. *See, e.g.*, *Baddock v. Balt. Cty.*, 239 Md. App. 467, 477 (2018) ("[W]hen determining whether an ordinance satisfies Article 24 of the Maryland Declaration of Rights, we ask rhetorically whether the legislative enactment, as an exercise of the legislature's police power, bears a *real and substantial relation* to the public health, morals, safety, and welfare of the citizens of the State or municipality. *The rational basis test is highly deferential; it presumes a statute is constitutional and should be struck down only if the reviewing court concludes that the Legislature enacted the statute irrationally or interferes with a fundamental right*.") (cleaned up) (emphasis added)). And when applying the traditional rational basis test under Article 24, courts "perform a very limited function, resisting interference unless it is shown that the legislature exercised its police power arbitrarily, oppressively, or unreasonably." *Tyler*, 415 Md. at 500.

### b. *Article 24 rational basis*

The Food Trucks ground their argument for less deferential rational basis scrutiny in two Court of Appeals decisions. Those cases invalidated legislation that impaired important, but non-fundamental, constitutional rights. *See Waldron*, 289 Md. at 683; *Verzi*, 333 Md. at 411. Both are still good law, both applied Article 24 rational basis scrutiny to legislation implicating important personal rights, and neither supports the application of less deferential scrutiny here.

Article 24 rational basis scrutiny differs from its federal counterpart. Both begin with a strong presumption that laws are constitutional, and both require courts to determine only whether the challenged legislation relates rationally to a legitimate government

24

interest. *See, e.g.*, *McGowan v. Md.*, 366 U.S. 420 (1961); *Kirsch v. Prince George's Cty.*, 331 Md. 89, 98 (1993). Under the Fourteenth Amendment, this highly deferential standard applies unless the legislation designates a suspect (or quasi-suspect) class or implicates a fundamental right. In the absence of a legislative designation that triggers strict or intermediate scrutiny, federal courts do not delve into the nature or extent of the claimed infringement, and "[a] statutory discrimination will not be set aside if *any state of facts reasonably may be conceived to justify it.*" *McGowan*, 366 U.S. at 426 (emphasis added).[12]

Legislation that passes federal constitutional muster can fail Article 24 rational basis review, however. *Verzi*, 333 Md. at 417. Under Article 24, Maryland courts look at the nature of the right infringed by a challenged statute, regardless of whether the right at issue has been declared fundamental under the U.S. Constitution. So long as the law doesn't impair important private rights, traditional rational basis applies. But when important private rights are implicated, we conduct a more searching inquiry into the *rationality* of the challenged legislation. The Court of Appeals has described this Article 24 standard as "a higher degree of scrutiny than the traditional rational basis test[:]"

> Finally, there are classifications which have been subjected to a higher degree of scrutiny than the traditional and deferential rational basis test, but which have not been deemed to involve suspect classes or fundamental rights and thus have not been subjected to the strict scrutiny test. Included among these have been classifications based on gender, discrimination against illegitimate children under some circumstances, a

---

[12] Although the Supreme Court itself does not recognize it, U.S. Constitutional scholars have noted that, at times, the Court seems to employ a more searching review under the guise of traditional rational basis review. *See, e.g.*, *Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985).

> classification between children of legal residents and children of illegal aliens with regard to a free public education, and a classification under which certain persons were denied the right to practice for compensation the profession for which they were qualified and licensed.

*Murphy v. Edmonds*, 325 Md. 342, 357 (1992) (internal citations omitted).[13] That said, it's still rational basis scrutiny—we just look more closely at the rationale.

When a statute implicates important personal rights, Maryland courts "have not hesitated to carefully examine [the] statute and declare it invalid" when its distinctions do not further its objectives rationally. *Verzi*, 333 Md. at 419. Article 24 rationality depends on context—a legislative distinction that might be rational in some circumstances may be irrational in others, depending on the nature of the right infringed and the extent of the infringement. *Waldron*, 289 Md. at 722 ("[O]ne cannot evaluate the reasonableness of a legislative classification without comparing it to the purpose of the law."). When important personal rights are at stake, the margin of legislative error is thinner, and courts "will not ride the vast range of conceivable purposes [for the challenged statute]. Rather, we must evaluate [] those statutory purposes which are readily discernible[,] . . . . those purposes that are obvious from the text or legislative history of the enactment, those plausibly identified by the litigants, or those provided by some other authoritative source." *Id.* In other words, Article 24 requires a closer fit between the means and the ends of a regulation that affects important personal rights, and it does not permit courts to speculate about the legislature's purpose. *Id.* at 713.

---

[13] The final classification the Court lists is a reference to *Waldron*.

The Food Trucks attempt to analogize to *Waldron* and *Verzi*, the only two cases they cite—and the only ones we have found—that applied Article 24 rational basis to invalidate legislation affecting important personal rights. In *Verzi*, the Court of Appeals struck down a county regulation that required towing operators to be located within Baltimore County as a condition of obtaining a license to operate there. The Court found that the legislation's locational preference failed Article 24 rational basis review because it wasn't related to the county's interest in regulating towing services:

> Because we can find no rational basis for the distinction between in-county and out-of-county towers, we are led to the more reasonable and probable view that the classification was intended to confer the monopoly of a profitable business upon the residents of the [county]. . . . Baltimore County has comprehensively regulated the towing business such that it effectively controls which towers will receive business and which will not. By requiring all of its towers to be located within the county boundaries, Baltimore County has, in effect, conferred the monopoly of a profitable business upon certain Baltimore County businesses.

*Id.* at 427 (cleaned up).

The Food Trucks suggest that the 300-foot rule is "even more blatantly anti-competitive than the restrictions the Court of Appeals struck down in *Verzi*." To be sure, the Court of Appeals said in *Verzi* that "in areas of economic regulation . . . this Court has been particularly distrustful of classifications which are based solely on geography, *i.e.*, treating residents of one county or city differently from residents of the remainder of the State." *Id.* at 423.[14] And we agree that "the power of the Legislature to restrict the

---

[14] *But see Supermarkets Gen. Corp. v. State*, 286 Md. 611 (1979) (upholding a legislative distinction, based on county location, among types of businesses subject to Sunday closing

27

application of statutes to localities less in extent than the State . . . cannot be used to deprive the citizens of one part of the State of the rights and privileges which they enjoy in common with the citizens of all other parts of the State . . . ." *Id.* at 424 (*quoting Maryland Coal and Realty Co. v. Bureau of Mines*, 193 Md. 627, 642 (1949)).

But the Food Trucks have the analysis backwards. *Verzi* does not stand for the blanket proposition that legislation favoring one set of businesses over another is categorically impermissible—only that a Dormant Commerce Clause-esque preference grounded in geography or residence is. *Verzi*, 333 Md. at 423 ("Although we have not yet expressly stated so, it is evident that elements of our Article 24 equal protection jurisprudence are analogous to those found in the Commerce Clause and the Privileges and Immunities Clause of Article IV, Section 2 of the United States Constitution."). Put another way, the holding in *Verzi* would preclude the City from conditioning mobile vendor licenses on City residence. This case doesn't present that form of regulation: the 300-foot rule regulates the places *all* City-licensed mobile vendors can operate in Baltimore City, wherever those food trucks are parked at idle. That is classic economic regulation subject to the most deferential review.

The Food Trucks point as well to *Attorney General v. Waldron*, 289 Md. 683 (1981), and the circuit court found it persuasive, "[a]pplying the Waldron Court's analysis" and concluding that the Trucks' "right to operate their business in Baltimore City is encompassed within the guarantees of Article 24 of the Maryland Declaration of

laws).

28

Rights . . . . [and that] [t]herefore, heightened rational basis review is warranted here." But like *Verzi*, *Waldron* featured an altogether different kind of regulation than we have here. *Waldron* involved a statute that prohibited retired judges from practicing law for profit. 289 Md. at 683. The Court held that the statute "effectively denie[d] persons the ability to pursue their chosen vocation," *id.* at 727, and that it merited more vigorous review:

> [W]hen important personal rights, not yet held to merit strict scrutiny but deserving of more protection than a perfunctory review would accord, are affected by a legislative classification, a court should engage in a review consonant with the importance of the personal right involved. This [] judicial inquiry does not tolerate random speculation concerning possible justifications for a challenged enactment; rather, it pursues the actual purpose of a statute and seriously examines the means chosen to effectuate that purpose.

*Id.* at 713. Using that standard, the Court found the statute both over- and under-inclusive, found that it failed to further its stated objective, and struck it down. *Id.* at 724.

We see important distinctions between the 300-foot rule and the statute challenged in *Waldron*. Again, "unequal treatment, in and of itself, [doesn't] necessarily [violate] equal protection, for the inequality resulting from legislative line-drawing in pursuit of legitimate state interests must be weighed against the *right which is deprived* [for] those who are treated differently." *Waldron*, 289 Md. at 727 (emphasis added). The statute at issue in *Waldron* was "not . . . an economic regulation . . . rather, it flatly denie[d] [retired judges] the right to engage in the practice of the profession for which [they are] otherwise qualified." *Id.* at 717. And the 300-foot rule does not deny the Food Trucks the opportunity to engage in their chosen vocation. *Id.* Their right to be mobile vendors isn't threatened, only their right to park and sell in certain places within Baltimore City. This purely

29

economic regulation gets the highest level of legislative deference under traditional rational basis review. *Waldron,* 289 Md. at 717 ("where vital personal interests (*other than those impacted by wholly economic regulations*) are substantially affected by a statutory classification" courts employ a more searching review) (emphasis added).

### 3. The 300-foot rule is rationally related to a legitimate government interest.

Under Article 24, our assessment of equal protection and due process challenges to an economic regulation like the 300-foot rule are "nearly identical . . . . In such a case, we employ the least exacting and most deferential standard of constitutional review, namely, rational basis review, under which a legislative classification will pass constitutional muster so long as it is rationally related to a legitimate government interest." *Tyler*, 415 Md. at 501. Against that deferential standard, we hold that the 300-foot rule rationally furthers the City's legitimate interest in addressing the free-rider problem that arises when mobile vendors set up within a block of direct brick-and-mortar competitors.

The City's broad police power includes the power to legislate in the general welfare. *Salisbury Beauty Schools*, 268 Md. at 47. The City's legislative decisions enjoy a strong presumption of constitutionality, and that presumption remains intact when the challenged legislation distinguishes based on non-suspect criteria, *Baddock*, 239 Md. App. at 481, "despite the fact that, in practice, [the] laws result in some inequality." *Supermarkets Gen. Corp.*, 286 Md. at 617 (*quoting McGowan*, 366 U.S. at 425–26). "Legislative bodies are permitted to make commercial classifications that distinguish between entities," and we won't strike down such a statute unless its challenger can demonstrate that the City used its power arbitrarily, oppressively, or unreasonably. *Baddock*, 239 Md. App. at 480–81;

30

*Salisbury Beauty Schools*, 268 Md. at 47.

The restrictions the 300-foot rule imposes are not arbitrary, oppressive, or unreasonable, and are directly relevant to the policy adopted to promote the general welfare. *Salisbury Beauty Schools*, 268 Md. at 57 (*citing Nebbia v. N.Y.*, 291 U.S. 502, 537 (1934)). The City enacted the 300-foot rule to address "the potential for pecuniary harm arising from food trucks acting as 'free-riders' on the economic investments that brick-and-mortar restaurants make in their specific and fixed locations." According to the Food Trucks' own business plans, they wish to park and sell in neighborhoods with vibrant streets populated by brick-and-mortar restaurants. The character of those neighborhoods is inseparable from the presence of the resident businesses. It is, in fact, *because of* brick-and-mortar businesses that Pizza di Joey and Madame BBQ wish to park and sell in neighborhoods like Hampden, Mt. Vernon, Harbor East, and Federal Hill. And requiring mobile vendors to keep a 300-foot distance rationally addresses the City's concerns that their business will harm their brick-and-mortar counterparts.

It overstates the impact of the 300-foot rule to say, as the Food Trucks do, that it "effectively prohibited them from operating in viable commercial corridors." To the contrary, the severity of the rule's limitations depends on the restaurants in each neighborhood and the type of food a mobile vendor sells. The Food Trucks themselves illustrate the point—Pizza di Joey will undoubtedly be restricted more than MindGrub Café because the ubiquity of brick-and-mortar pizzerias means there is less area in which a mobile pizzeria can operate outside of the 300-foot zone surrounding each one. In a neighborhood like Hampden, with at least five pizza-focused restaurants on its busiest

31

commercial street, Pizza di Joey may well be unable to operate altogether on the most popular blocks. But MindGrub Café has fewer competitors and, therefore, fewer blocks that are off-limits. And that makes sense, given the rule's aim to protect brick-and-mortars from direct competition. The varying effects track the 300-foot rule's legitimate purpose directly, and those effects are neither arbitrary nor irrational. *See Tyler*, 415 Md. at 501 ("[w]e will uphold a statute subject to rational basis review against an equal protection challenge unless the varying treatment of different groups or persons is so unrelated to the achievement . . . of [a] legitimate purpose[] that the court may conclude only that the governmental actions were arbitrary or irrational.").

We offer no views on the wisdom or the economic efficacy of the 300-foot rule. Our role is not to screen for bad policy, but for unconstitutional legislation, and with respect to economic regulation in particular, "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne*, 473 U.S. at 440. So long as "there are plausible reasons for the legislative action, the court's inquiry is at an end." *Tyler*, 415 Md. at 502. And because the 300-foot rule rationally furthers the legitimate government interest of protecting brick-and-mortar establishments from free-riding mobile vendors by requiring them to keep their distance from direct competitors, it doesn't violate Article 24.

**C. The 300-foot rule is not unconstitutionally vague.**

Despite finding that the 300-foot rule "is constitutional and does not infringe on the [Food Trucks'] Due Process and Equal Protection rights," the circuit court granted the Food Trucks' request for an injunction after finding the rule void for vagueness. The circuit court

32

specifically found objectionable the phrases "primarily engaged in," "same type of food product," and "300 feet."[15] We reverse the circuit court's void for vagueness finding because (1) the Food Trucks never pled, then expressly disclaimed, a void for vagueness challenge and (2) even if pled, neither a facial nor as-applied vagueness challenge can properly be considered in this case.

A finding that a statute is void for vagueness is a finding that the statute is unconstitutional. *Galloway v. State*, 365 Md. 599, 611 (2001). Vagueness is another way of stating the due process principle that statutes must provide "persons of ordinary intelligence and experience . . . a reasonable opportunity to know what is prohibited so that they may govern their behavior accordingly." *Id.* at 615–16 (*quoting Williams*, 329 Md. at 8)*.* A statute must also provide "legally fixed standards and adequate guidelines for police . . . and others whose obligation it is to enforce, apply, and administer [it]." *Id.* (cleaned up). "To survive [void for vagueness] analysis, a statute must eschew arbitrary enforcement in addition to being intelligible to the reasonable person." *Id.* (cleaned up). A statute is not unconstitutionally vague "if the meaning of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, *if* they possess a common and generally accepted meaning." *Id*. Nor is a statute void for vagueness "merely because it allows for the exercise of some discretion" in its enforcement. *Bowers v. State*, 283 Md. 115, 122 (1978).

---

[15] The circuit court resolved the issue of how to measure 300 feet "by directing that the distance must be measured from the closest point of the space in the building that is occupied by the restaurant . . . to the closest point of the food truck."

The Food Trucks did not include a vagueness challenge in their initial pleading. Through discovery and trial, though, they seemed often to be arguing vagueness indirectly. For example, when they deposed Ms. Montgomery and Mr. Lima, the Food Trucks made much of the witnesses' inconsistent and subjective interpretations of the rule, and especially of the language "primarily engaged in" and "same type of food product." And in their arguments in the trial court, the Food Trucks frequently mentioned that the inconsistencies in interpretation created a problem with arbitrary enforcement.

The trial court picked up on this, and during closing arguments, interrupted counsel for the Food Trucks to clarify the contours of their arguments:

> THE COURT: So am I hearing you say that--that it's really it's a two fold argument? That on the one hand it's an argument that the regulation . . . in general is unconstitutional? . . . But even if the Court would not find that to be the case the way-- you're saying that the way this regulation was set up, because of the vagueness, because of the--you know, the ability to interpret in different ways this specific regulation is an issue?
>
> FOOD TRUCK'S COUNSEL: That's exactly--there's two points, Your Honor. And I think you summarized it pretty accurately there.

After the Food Trucks appeared to embrace a void for vagueness argument, the City responded that a vagueness challenge would not be appropriate in this case because (a) a facial challenge is impermissible (more on that below), and (b) there are no acts of enforcement against Pizza di Joey or Madame BBQ through which to measure the fairness of the rule as applied. The Food Trucks replied in no uncertain terms that "*we didn't raise a void for vagueness challenge*." So the total absence of vagueness allegations in their complaint and the Food Trucks' unambiguous waiver of the claim during closing

arguments should have ended the inquiry, and the circuit court erred by invalidating the 300-foot rule on a theory that the Food Trucks never raised and then disavowed.

Preservation aside, the fact that the 300-foot rule has never been enforced against the Food Trucks deprived the circuit court of a record on which to assess the 300-foot rule's vagueness as applied. *Bowers*, 283 Md. at 122 ("[T]he constitutionality of a statutory provision under attack on void-for-vagueness grounds must be determined strictly on the basis of the statute's application to the particular facts at hand."); *Galloway*, 365 Md. at 616 (cleaned up) (Except in the First Amendment context, it is "immaterial that the statute is of questionable applicability in foreseeable marginal situations . . . ."). Instead, the circuit court made its vagueness finding based on "voluminous evidence regarding the ambiguity of the 300-foot rule" that came out in the testimony of Mr. Vanoni, Ms. McGowan, Mr. Lima, and Ms. Montgomery. Because it was not based on any particular set of facts, the circuit court's decision amounted to finding the 300-foot rule unconstitutionally vague on its face. And a facial vagueness challenge can be made only when the challenged statute implicates a fundamental constitutional right. *Galloway*, 365 Md. at 616; *see also Ayers v. State*, 335 Md. 602, 624 (1994). In Maryland, we have only ever entertained a facial vagueness challenge when the challenged statute implicated the First Amendment, out of concern for the chilling effect a vague statute might have on free speech. *Galloway*, 365 Md. at 616 n. 11; *Ayers*, 335 Md. at 624. Federal courts have drawn an even harder line: "[f]acial vagueness challenges to criminal statutes are allowed *only* when the statute implicates First Amendment rights." *U.S. v. Klecker*, 348 F.3d 69, 71 (4th Cir. 2003), *overruled on other grounds by McFadden v. U.S.*, 135 S.Ct. 2298 (2015) (emphasis added).

There is no dispute that the Food Trucks have not alleged a violation of any fundamental constitutional right, and for that reason their claims should not have been analyzed as a facial challenge.

There may well be close questions about the scope of the 300-foot rule as food trucks grow and spread in Baltimore. We can imagine, for example, that a hot dog truck might dispute that a brick-and-mortar deli is "primarily engaged in" selling the "same type of food product," while the deli might claim that it is.[16] But the City need not resolve the hot dog/sandwich conundrum to the satisfaction of all in order to avoid a vagueness challenge. The City could reduce the possibility of confusion or vagueness by promulgating regulations or providing guidance about how it plans to enforce the rule—perhaps by adopting the Cube Rule of Food Identification[17] or some other set of guidelines. But even

---

[16] *See, e.g.*, *To Chew On: 10 Kinds of Sandwiches*, MERRIAM-WEBSTER, https://www.merriam-webster.com/words-at-play/to-chew-on-10-kinds-of-sandwiches/hot-dog (Merriam-Webster dictionary definition of sandwich includes hot dog when served on a roll); Allison Shoemaker, *So is a hot dog a sandwich? The results so far*, THE TAKEOUT (November 25, 2018), https://thetakeout.com/so-is-a-hot-dog-a-sandwich-the-results-so-far-1830643902 (opining, based on survey of thirty-four actors, writers, athletes, journalists, and radio personalities that a hot dog is not a sandwich); Erica Chayes Wida, *People are furious that Oscar Mayer said a hot dog is a sandwich*, TODAY (November 2, 2018), https://www.today.com/food/oscar-mayer-said-hot-dog-sandwich-internet-divided-t141146; *Stephen Works Out With Ruth Bader Ginsburg*, THE LATE SHOW WITH STEPHEN COLBERT (March 21, 2018), https://www.youtube.com/watch?v=0oBodJHX1Vg (hot dog is a sandwich according to Colbert's definition); *Is a Hot Dog a Sandwich*, NATIONAL HOT DOG AND SAUSAGE COUNCIL (November 6, 2015), http://www.hot-dog.org/press/national-hot-dog-and-sausage-council-announces-official-policy-hot-dog-sandwich-controversy ("a hot dog is an exclamation of joy, a food, a verb describing one 'showing off' and even an emoji. It is truly a category unto its own.").

[17] *See The Cube Rule of Identification*, http://cuberule.com/. The Cube Rule "identif[ies] any food purely by the location of the structural starch. Imagine a cube, then the starch

without a formal food taxonomy in hand, City enforcement authorities are allowed to exercise reasonable discretion in applying the 300-foot rule. And the absence of any enforcement activity against Pizza di Joey or Madame BBQ left the parties and the circuit court only to speculate about where those margins might be. Courts can only evaluate the as-applied vagueness of a statute in context, against a record in which the City has, in fact, exercised its discretion. Courts cannot evaluate the application of a statute in a vacuum, though, and the circuit court erred in evaluating this statute for vagueness on this record, even if the Food Trucks had postured a vagueness claim in the first place. *See Bowers*, 283 Md. at 122.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. APPELLANTS/CROSS-APPELLEES TO PAY COSTS.**

---

item (bread, wrap, crust). A food item with starch on the bottom (pizza, pumpkin pie) is *toast*; starch on the top and bottom (lasagna, quesadillas, sandwiches) is a *sandwich*; starch on three sides (hot dogs, subs, a slice of pie) is a *taco*; starch on four sides (wraps, enchiladas, pigs in blankets) is *sushi*; starch on five sides with the top open (cheesecake, bread bowls with soup, falafel pitas, deep dish pizza) is *quiche*; and items fully enclosed in starch (burritos, corn dogs, covered pies, dumplings) is a *calzone*. Anything not encased in starch (steak, mashed potatoes, spaghetti, poutine) is a *salad*. This Rule hardly can be said to yield uniformly satisfying answers, but it certainly isn't vague.